# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ELLE LALLI,

               Plaintiff,

v.

WARNER BROS. DISCOVERY, INC.;
WARNER MEDIA, LLC U.S. SEVERANCE
PLAN,

               Defendants.

Civ. No. 1:24-cv-03178-LJL

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

The Plaintiff, Elle Lalli (hereinafter, "Plaintiff"), by and through the undersigned counsel,
Carey & Associates, P.C., files this First Amended Complaint as a matter of course under
Federal Rule of Civil Procedure 15(a) against the Defendant, Warner Bros. Discovery, Inc.
(hereinafter, "Defendant WBD" or "WBD"). Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff's Complaint asserts continuous pattern and practice claims for: (1)

discrimination based on race in violation of Title VII of the Civil Rights Act, 42 U.S.C. §

2000e-2(a)(1) (hereinafter, "Title VII"); (2) discrimination based on race in violation of

42 U.S.C. § 1981; (3) discrimination based on race in violation of New York State

Human Rights Law, N.Y. Exec. Law § 296; (4) discrimination based on race in violation

of New York City Human Rights Law § 8-107; (5) discrimination based on age in

violation of Age Discrimination in Employment Act (hereinafter, "ADEA"); (6)

discrimination based on age in violation of New York State Human Rights Law, N.Y.

Exec. Law § 296; (7) discrimination based on age in violation of New York City Human

Rights Law § 8-107; (8) discrimination based on sex in violation of Title VII; (9)

discrimination based on sex in violation of New York State Human Rights Law, N.Y.

Exec. Law § 296; (10) discrimination based on sex in violation of New York City Human

Rights Law § 8-107; (11) discrimination based on disability in violation of the Americans

with Disabilities Act, 42 U.S.C. § 12101, et seq., (hereafter, "ADA"); (12) discrimination

based on disability in violation of New York State Human Rights Law, N.Y. Exec. Law §

296; (13) discrimination based on disability in violation of New York City Human Rights

Law § 8-107; (14) discriminated based on sex in violation of Equal Pay Act, 29 U.S.C. §

206(d); (15) breach of the implied covenant of good faith and fair dealing; (16)

intentional infliction of emotional distress; and (17) violation of ERISA Sections

502(a)(1)(b) and (a)(3) in denying claim for severance benefits and material

misrepresentation of the terms of the Plan.

## **<u>PARTIES</u>**

2.    Plaintiff, Elle Lalli, is a resident of the State of Georgia, and resides in Atlanta, Georgia.

Plaintiff worked for Defendant WBD remotely from her home office in Georgia. Plaintiff

also worked remotely with Defendant WBD's New York City office. Plaintiff is also a

plan participant under the Warner Media, LLC U.S. Severance Plan and now asserts her

ERISA Section 502(a)(1)(b) and (a)(3) claims against both defendants.

3.    Defendant Warner Bros. Discovery, Inc. is a global media and entertainment company,

incorporated in Delaware, but maintains its worldwide corporate headquarters at 230 Park

Avenue South, New York, New York 10003. At all times relevant to this Complaint,

Defendant WBD conducted business within and subject to the jurisdiction of this Court.

Specifically, Defendant WBD affiliations with the State of New York are so continuous

and systematic as to render it essentially at home in the State of New York. Defendant
Warner Bros. Discovery, Inc. is also the Plan Sponsor of the Warner Media, LLC U.S.
Severance Plan, pursuant to ERISA.

4.      Defendant the Warner Media, LLC U.S. Severance Plan is maintained and run from the
same 230 Park Avenue South, New York, New York 10003 address as the Plan Sponsor
Defendant Warner Bros. Discovery, Inc.  Pursuant to ERISA, this Court has federal
question jurisdiction over Plaintiff's ERISA Sections 502 (a)(1)(b) and (a)(3) claims.

## PROCEDURAL PREREQUISITES

5.      On December 4, 2023, Plaintiff filed a "dual charge" of discrimination against Defendant
WBD the United States Equal Employment Opportunity Commission ("EEOC"), and on
December 6, 2023 with the New York City Commission on Human Rights ("NYCHRC")
and New York State Division on Human Rights ("NYDHR").

6.      On February 6, 2024, the EEOC sent a Notice of Right to Sue letter regarding Charge No.
410-2024-02385 to the Plaintiff. (Exhibit "A").

7.      Plaintiff exhausted all administrative remedies with respect to her claims concerning
discrimination because of her race, age, gender, and disability under both Federal, State
and Local law.

## JURISDICTION AND VENUE

8.      Plaintiff's claims pursuant to ADEA, Title VII, 42 U.S.C. § 1981, ADA, and Equal Pay
Act raise questions of federal law.

9.      This Court has jurisdiction over the ADEA, Title VII, 42 U.S.C. § 1981, ADA, and Equal
Pay Act claims pursuant to 28 U.S.C. § 1331. Pursuant to ERISA, this Court has federal
question jurisdiction over Plaintiff's ERISA Sections 502 (a)(1)(b) and (a)(3) claims.

10.     This Court has supplemental jurisdiction over Plaintiff's remaining claims, including
        those under the New York State Human Rights Law, N.Y. Exec. Law § 296 and New
        York City Human Rights Law § 8-107.

11.     Plaintiff was at all relevant times a resident of the State of Georgia, having her principal
        residence in Georgia. Plaintiff worked remotely out of Defendant WBD's New York
        offices.

12.     Defendant WBD is a domestic company incorporated in Delaware, and their corporate
        office is located in New York, New York 10003.

13.     Starting from April 15, 2020 to the present, Plaintiff had daily contacts and contacts
        multiple times a day with Defendant WBD's New York City office via various
        communications and Zoom meetings with clients, partners, and team members (totaling
        close to at least 1,000 contacts), attended townhalls based out of the New York City
        office, and several of Plaintiff's clients were based in New York City. Several members
        of Plaintiff's team (direct reports and indirect reports) have been based there as well. In
        today's new age of remote work, Plaintiff worked remotely in the New York City office.
        Plaintiff experienced ongoing and continuous discrimination during the aforementioned
        time period.

## FACTUAL ALLEGATIONS

14.     Plaintiff is 50 years old and her date of birth is #########, 1973.

15.     On April 15, 2020, Plaintiff began working at WarnerMedia Services, LLC
        ("WarnerMedia" or "WM") as a consulting compensation leader. She was given a title in
        the system as "Compensation Partner Leader," which is different than her direct peers
        who had "VP, Compensation" or "Executive Director, Compensation" titles when she

joined the company. Plaintiff's manager was Jean Ermer, SVP Global Total Rewards.

Plaintiff started her position with a base salary of $265,000 and 25% annual bonus target.

16. Later in April 2022, WarnerMedia would merge with Discovery and become Warner

Bros. Discovery, Inc. ("WBD").

17. WBD is a global media and entertainment company with corporate headquarters located

at 230 Park Avenue South, New York, NY 10003.

18. Prior to Plaintiff joining, the remit/scope of the role was increased without her consent;

therefore, the new role became a much larger role than the role she accepted.

WarnerMedia had about 30,000 employees in total globally (the majority of employees

are/were based in the United States and Canada ("US/CAN"), with approximately 5,000

employees in other countries). The Company had 6 Business Units ("BUs").

19. Prior to joining WarnerMedia ("WM"), Plaintiff worked for Cisco Systems, Inc.

("Cisco"), which has $51+ billion in revenue and over 80,000 employees globally. At

Cisco, she held multiple leadership roles, including a key strategic partner in designing

and standing up a first-time-through global internal start-up/incubator environment

replicating a start-up compensation offering and use of performance restricted stock units.

This critical effort allowed Cisco to fast-track innovation, disrupt the market via a pivot

towards SaaS (Software as a Service) offerings and attract/retain top-notch talent from

top big tech competition. Overall annual investment was over $500 million in equity

alone and high-visibility with ELT (Executive Leadership Team) and Board of

Directors/Compensation Committee. In addition, Plaintiff led the compensation

consulting effort for the Engineering line of business globally (approximately 35,000

employees), requiring people leadership for six direct reports in multiple locations, close

partnership and direction provided to regional compensation partners, while directing

sub-teams within the Global Compensation Center of Expertise ("CoE"), such as market

pricing and planning and analytics resources to support design and consulting offerings,

and cross-team partnership with HRBP (HR Business Partner), Finance, Legal, and

Equity teams. The pace at Cisco was very fast (as was the case at many of Plaintiff's

previous companies, such as Bain & Company, Accenture, and Home Depot). Her roles

were often new and typically required leading high profile, transformational, end-to-end

delivery. Plaintiff has a consistent track record of success and measurable impact enabled

by the level of support and advocacy from her manager/leaders and partners.

20.    Within 1-2 weeks leading up to her start date at WM, Plaintiff was informed by Jean

Ermer that they had suddenly changed the scope of her new role due to the unexpected

departure of a compensation team lead. They added one of the largest, and Plaintiff was

told, more challenging BUs, News/CNN & Sports (Turner Sports). Jacque Wright could

have taken on this BU, but it was thrust upon Plaintiff instead. Plaintiff had already

resigned from Cisco and was put in an extremely financially challenging situation, such

that she felt she could not decline the role despite a bait and switch to her role scope.

21.    As a result, Plaintiff's scope/remit would be substantially larger than the scope/remit of

the other WarnerMedia Global TR/Compensation team consulting leaders (Jacque Wright

and Becky Eshalomi).

a.    When Plaintiff accepted the Compensation leader role, the scope was for 3 BUs

and about 10,000 employees in total. The BUs consisted of 1) the WM

Technology Office; 2) Revenue & Distribution; and 3) Corporate Functions,

which included Finance, Legal, and Human Resources. Her total team size was to

be: 4 full time employees ("FTEs"), 2 filled and 2 open for Plaintiff to hire; therefore, only half of the team was staffed.

b.   Upon Plaintiff joining, her remit <u>increased</u> to 4 BUs (adding News/CNN & Sports) resulting in about 15,000 total employees – her scope increased substantially carrying <u>half</u> of WarnerMedia total employee population. News/CNN & Sports were known to be challenging because the of 24/7 nature of news and live sports/especially during Covid. She was told they also had a reputation of being a demanding client group.

c.   The entire global organization was shared with two other consulting peers, Jacque Wright (Black male) and Becky Eshalomi (Black female). Jacque Wright and Plaintiff shared the US/CAN populations, which is where the bulk of the employee population sat. Becky Eshalomi led the international population of about 5,000 employees. With the last-minute increase in Plaintiff's scope, she now carried 4 of the 6 BUs, and approximately 15,000 employees in total. Jacque's remit was 2 BUs and approximately 10,000 employees. Her total team size became 7 FTEs, only 3 filled and 4 open roles to be filled, resulting in less than a half-staffed team to carry out her now larger role. Plaintiff's peer, Jacque Wright, had 9 total FTEs, with 7 filled (mostly senior roles) and 2 open roles for entry Analysts. Plaintiff was set up to fail since joining.

22.   In addition to her day-to-day compensation consulting responsibilities, Plaintiff was expected to accelerate a first time through, business critical Global Job Architecture/Career Framework for critical technical talent population for the direct-to-consumer ("DTC") products, such as HBOMAX and CNN-Digital. The framework

7

required a market competitive career path via job architecture and a new, differentiated compensation design (including an aggressive offering of equity/RSUs, which was not common practice at WM), final approval from Executive Leadership Team, ("ELT") and implementation/go-to-market for the new career framework by January 1, 2021 (a very aggressive 8 month timeline as a new employee while also needing to fill more than half of the roles on her team (4 open roles). This high-profile, high-impact program enabled the business and talent strategy to attract and retain critical technical talent needed to support the various launches for HBOMAX and eventually CNN+. The external talent competition focused on Netflix, Amazon, Meta, Google, Microsoft, Apple and Disney/Hulu.

23.     When the fourth BU was initially added to her remit, Plaintiff told Jean that she needed to reconsider her decision and needed time to discuss it with her husband. After not hearing from Plaintiff for a few days, Jean countered with $20,000 more in base salary, bringing her base salary to $265,000 (her original offer was $245,000). Plaintiff still paused. Ultimately, she was in a conundrum since she had already given notice at Cisco, as mentioned above. When Plaintiff had joined, Jacque (her peer) only had 2 BUs and he made a very similar base salary to her offer when she was handling 4 BUs. Even then, if Plaintiff's remit remained at 3 BUs, she would have made $245,000 to Jacque's about $262,800 for 2 BUs. Thus, she would have made $17,800 less for a larger remit.

24.     Upon information and belief, Jacque made $262,800, but when Jean countered Plaintiff's original offer with $265,000 shortly after she started, Jacque received an ad hoc market adjustment of $5,000 resulting in his salary at $267,800. Therefore, he always made more than Plaintiff for lesser scope/remit in comparison to her.

25.     Plaintiff was the ONLY external hire of Jean Ermer's (SVP of Global Total Rewards)
        team. Jean worked for Warner Brothers ("WB") for many years. All other peer roles were
        former WB direct reports of Jean with 10+ years of experience working together.  Since
        day one, the environment was a Plaintiff versus WB favoritism game. There was a lack of
        diverse market experience (outside of the WB way) and she experienced feelings of
        exclusion and lack of support. Her direct reports also shared the same sentiments, feeling
        their ideas or suggestions were not being heard by others/leadership, and would raise
        concerns to Plaintiff, which she would bring to Jean Ermer, but were met with no action
        to address. Of the three roles filled on Plaintiff's team when she joined, each were former
        HBO or Turner. They expressed frustration about not being fairly considered for certain
        roles and the lack of resources they received while witnessing other teams adequately
        staffed – the majority of whom were legacy WB teams.

26.     In late summer and early fall of 2020, the new WM CEO, Jason Kilar, announced an
        Operating Model change, which finally forced Jean Ermer to shift the BU client groups
        between Jacque Wright and Plaintiff. As of January 1, 2021, Plaintiff had 3 BUs instead
        of 4, but she had to share two team members (Angela Spivak and Julia Clowe) with
        Jacque for almost one year. As of note, when Plaintiff had 4 BUs, Jacque did not share
        any of his team members with her. She continued to have fewer headcount, still only
        seven total. Jacque had seven filled roles with one of the two open Analyst roles elevated
        to a Compensation Partner role (mid-level role versus entry level) to help support the two
        BUs he took on from Plaintiff, which were Corporate Functions and Ad Sales &
        Distribution. Jacque had four team members (which included the now elevated Analyst

9

open role) to support these two BUs, while she was expected to support them with only two FTEs.

## ADVERSE ACTION

27. From Summer 2020 to the end of 2022, Plaintiff was harassed by a senior HR Leader, Sharon White (Black female), SVP of HR for WarnerMedia Technology Office ("WMTO") based out of New York, for simply bringing her external, tech diverse experience to the table to help drive the transformational change WM was seeking (this type of expertise is the exact reason Plaintiff was sought after/approached by WM). The first blatant incident occurred in early October 2020. Sharon White approached Plaintiff's direct report, Mi Chang, speaking disparagingly about Plaintiff without any reason or context. Sharon shared that she refused to work with Plaintiff, instructing Mi Chang to be sure there were no meetings scheduled with her and Plaintiff together. Sharon White was one of the main stakeholders for the DTC Tech Talent Career Framework strategic effort; they had to be in meetings together. Mi Chang was put in an extremely awkward position by this senior leader. Mi Chang was compelled to make Plaintiff aware of what Sharon said, which Plaintiff very much appreciated.

## PROTECTED ACTIVITY

28. When Plaintiff raised the incident with Sharon to Jean Ermer and Joe Song, she was met without support. She was left to fend, or advocate for herself, meanwhile they allowed the bullying by Sharon to continue, and enabled it. Per Sharon's request, Jean Ermer attended her weekly implementation meetings on the DTC Tech Talent Career Framework go-to-market effort. Plaintiff assumed Sharon did this to intimidate her and essentially requested to have her manager present during meetings Plaintiff was leading

10

to "watch over her." Plaintiff asked Jean whether Sharon provided a reason for this request; Jean could not explain why the request was made. Jean never once added any useful or effective input during the meetings she attended nor provide any feedback to Plaintiff that would have suggested she conducted the meetings inappropriately. Nor did Jean defend Plaintiff in any way to Sharon to say that she was completely capable of driving this critical effort, and there is no need for her to spend her time babysitting Plaintiff. Plaintiff was brought to WM to lead exactly this type of high profile, fast-paced initiative, she was doing her job, and very successfully given her skillset and expertise despite the obstacles.

## PROTECTED ACTIVITY

29.    Plaintiff had done nothing to cause Sharon to attack her. Despite her concerns raised to WM Total Rewards leadership and nervousness/unsafe feelings to interact with Sharon, Plaintiff had to have her own conversation with her. Plaintiff specifically asked Jean Ermer and Joe Song, SVP TR, Talent Management, Talent Acquisition (Jean's manager) based out of New York, to please address Sharon with her as she was not comfortable speaking to her alone.  Instead, she received a very curt email from Sharon stating that, "Joe said we need to talk." During this conversation, Sharon told Plaintiff, "to never forget that WM is first and foremost a media, entertainment company, and not a tech company." Her approach was extremely unprofessional and certainly not expected from a SVP, HR of Technology Office for WM, who ideally is looking to help support the organization's talent strategy to attract and retain critical tech talent needed to successfully launch WM's DTC products.

11

30.     From August 2020 to January 2021 (during the roll-out of the approved DTC Tech Talent

Career Framework), Plaintiff would experience vomiting like clockwork on Fridays at the

end of workday every few weeks and it lasted most of the weekend. She would also feel

extremely lightheaded and dizzy. The extremely long hours due to insufficient resources

to carry out her remit, lack of eating/drinking well, and constant state of distress caused

by the work environment began to physically manifest. When she was sick for the

weekend, she would fall behind on home/family responsibilities. The pressure mounted at

home because of the lack of support/inadequate resources and hostile/unsafe environment

at work.

31.     WM/WBD perpetuates a toxic, hostile work environment as they favor certain

individuals versus properly supporting or recognizing those employees who are best

qualified for roles and driving change based on their protected status characteristics.

From the top down, there is not much trust due to the constant flip flopping of leadership

decision making. There is a perception that appointment or selection for roles are not

fairly considering the most qualified talent. This breeds mistrust and lack of support or

advocacy. There is blatant favoritism especially as discussed above based on protected

status characteristics. Plaintiff's direct peer, Jacque, was a direct beneficiary of this unfair

policy. Then, Scott, Julie, and Renu most recently (all of her peers).

32.     Plaintiff has physicals every year and normally takes very good care of herself. She was

never/rarely ever sick. Further, she had only gone to the doctor for well-visits, until she

joined WM/WBD. By the fourth month of vomiting and feeling unwell while working at

WM, she finally went to her PCP, who referred her to a gastroenterologist and

cardiologist. Each specialist ordered multiple tests (endoscopy and colonoscopy, EKG,

and ECHO). The tests revealed that the vomiting and lightheadedness was not caused from a condition, but likely a result of extreme stress from work manifesting in physical illness. Her PCP prescribed a low dose anti-anxiety medication and anti-nausea medication to manage stress and vomiting/nausea. She does not like taking prescribed medicines as it is not ideal for the body to have to process regularly, and was not thrilled to need to medicate, even at a low dosage to do her job. She only took the medication for 4-6 months to avoid the symptoms as she had no other choice to function in the hostile environment.

33.     In addition, in 2021-2022 timeframe, Plaintiff went to a dermatologist regarding her concerning hair loss. The PA confirmed Plaintiff did not have a hair loss condition, but she needed to reduce stress. Her hair loss was so bad that Plaintiff even bought a "Halo," which is hair piece she can add via a head band like extension to hide the hair loss. This only added more stress given the impact on her appearance.

34.     Prior to working for WM/WBD, Plaintiff had never experienced the above symptoms due to her work environment. She believes the extreme stress caused by the hostile work environment at WM/WBD lead to her illness, weight loss, and hair loss.

## ADVERSE ACTION & PROTECTED ACTIVITY

35.     In late November 2021, Plaintiff learned of a significant pay adjustment made to Jacque Wright, VP Compensation (Plaintiff's peer, Black male). She raised concerns to HR/Nicole Vaughn and Jean Ermer via email and phone, but she was met with minimal concern or urgency to address it or an explanation for why a significant adjustment was made given no change in role or promotion occurred. She had to follow up with each of them multiple times.

36.     As stated above, when Plaintiff started at WM in April 2020, Jacque made $262,800.
        Shortly thereafter, he received a pay adjustment of $5,000. Thus, Jacque made slightly
        more than her at $267,800 base salary while Plaintiff was brought in at $265,000 base
        salary with a much larger remit. In the fall of 2021, she learned of a significant pay
        adjustment to Jacque's compensation (this was an off-cycle adjustment, as the normal
        annual base salary increase occurs on approximately March 1 of each year). There was
        ZERO increase in scope to Jacque's role, yet he was given a $35,000 increase while
        ALSO keeping him eligible for the upcoming 4% merit cycle by making the adjustment
        retroactive to August 1, 2021. As a result, he saw an increase from $267,800 to $300,000
        retroactive to August 1, 2021, for merit eligibility, resulting in a $312,000 base salary at
        March 1, 2022 for a **total increase of $45,000** – at this time there were no
        performance/ratings in practice. In the meantime, Plaintiff continued to be staffed with
        fewer resources than Jacque to do her job, which was still a larger, very complex portion
        of the company following the client shift on January 1, 2021, and included the fast-paced,
        highly technical DTC/Streaming – HBOMAX and CNN+ product focus.

                                    **PROTECTED ACTIVITY**

37.     The unfair treatment by WM had become so overwhelming, such that Plaintiff went
        directly to HR, Nicole Vaughn (Black female), in confidence, who was not able to
        explain why Jacque received the significant pay increase when she had a larger, more
        complex portion of the company but received no pay increase. Throughout her entire
        career, she has never needed to go to HR for protection or concern of unfair treatment.
        Nicole sent Plaintiff to her manager, Jean Ermer, despite the fact that she wanted the
        conversation to be confidential out of fear of retaliation. After much follow-up with both

                                            14

Nicole and Jean, Jean claimed it was a "market adjustment for Geographic Differential."
However, when Plaintiff confirmed that the company did not apply a Geographic
Differential for VP+ as a policy or practice at WM, she explained that, "we are
considering implementing one." This was not a practice in place for WM nor is it a best
practice in the market. If this was policy, both Jacque and Plaintiff should have had a
more significant difference in pay for the first 18 months she was with WM. Plaintiff
asked why this was occurring now all of a sudden, and why was she not made aware of
this change in policy given she is a compensation consultant to the business, and she
would have to inform/consult on this type of policy/practice change for all other VPs
across her client groups. However, Plaintiff received no other explanation.

## ADVERSE ACTION

38. Only after her continued questioning, Jean Ermer finally adjusted Plaintiff's pay by
$15,000 (one-third of Jacque's increase) effective November 28, 2021. However, she did
so without any retro/backdating to earlier than October 1, 2021, as Jacque received,
which made Plaintiff ineligible for the 4% merit in March of 2022. Thus, Plaintiff was
begrudgingly given less than half the adjustment Jacque received, AND she was made
ineligible for the March 2022 merit program while Jacque's adjustment was back dated to
August 2021 to ensure he was also eligible for the annual increase in March 2022. This
was discriminatory as Plaintiff still carried a larger, arguably more complex, scope and
operated without a full team/fewer resources than Jacque to do a similar role. Now, she is
ALSO paid substantially less than her Black, male counterpart.

39. Up until Plaintiff became aware of the significant gender/race pay disparity, her title in
all systems was "Compensation Consulting Lead," which is a meaningless title (nor did it

exist) within WM. Thus, Plaintiff was made to feel minimized by not having a title that carried an equal "value" as her peers. She raised this issue to Jean Ermer multiple times over the next 18 months, but she was made to feel silly for being concerned about it and she was told that it would be fixed soon. It wasn't and still isn't.

40. Title is overly focused on at WM (and WBD) and it is definitely a status symbol and used to show importance/credibility. Jacque's title was "VP, Compensation" while Plaintiff was shown as only a "Compensation Consulting Lead." Her female, Black peer, Becky Eshalomi, based in the UK, had the title "Executive Director, Compensation." Titles drove eligibility for trainings, policies, communications, etc. at the time (this will/has changed on October 16, 2023). In addition to title, Management Level is a field/employee data element in the HRIS (human resources information system) that drives eligibility, for policies, such as severance.

41. During the time that Plaintiff raised the pay disparity and the title/Management Level concerns, the planned merger of WM and Discovery had already been announced and all employees were expecting a series of headcount reductions/cost synergies to occur in the coming months. Therefore, Management Level needed to be accurate in the system or Plaintiff would be treated less than her peers if her job was impacted/eliminated at that time. Jacque Wright and Becky Eshalomi's Management Level reflected "Vice President" in HRIS/Workday, while Plaintiff's Management Level only reflected as "Director." While Plaintiff was advocating for a pay adjustment to be treated equally to Jacque, she asked for her title and Management Level to be changed to reflect the same as her peers as well. Plaintiff's Management Level was made to Vice President, but her

title was only changed to Executive Director, Compensation, not Vice President as Jacque's title indicated, again her direct peer.

42.    A related observation, WM and now WBD, have been working on a Global Job Architecture initiative for several years. This requires leveling of all jobs from each of the companies based on similar scope, impact, complexity. In the new Job Architecture, that recently launched on October 16, 2023, Plaintiff and her peers will be a Career Band/level 5-Vice President. Shortly after Plaintiff's title was changed to Executive Director (in late fall 2021), she realized that all the women at the time only had the Executive Director title, while the only two males (Jacque Wright and Brian Mullin) had the Vice President titles.

**ADVERSE ACTION**

43.    On January 28, 2022, Plaintiff was unfairly accused/blamed by Sharon White, SVP of HR for WMTO, for something that was apparently inappropriately shared by an iStream Planet ("ISP") HR Business Partner, Chad Bauer, who sat on her team. This occurred in a meeting Plaintiff was not aware of nor invited to. ISP was an acquisition that was left as a standalone entity initially. The information shared supposedly sent the ISP leader, Jim Newkirk, into a tirade in the presence of other WMTO leaders, per Sharon White's recount of the situation. The meeting was held to discuss options for the approach to integrate ISP employees onto the DTC Tech Talent Career Framework. Chad shared an option that he thought Sharon preferred, but Jim would have been opposed to. Chad told Sharon that Plaintiff told him the option shared was her preference. Plaintiff had no such conversation with Chad.

44.    This ISP incident set off another series of panic attacks and extreme anxiety for Plaintiff.

A recent metabolism test showed chronic stress conditions resulting in concerningly high

cortisol levels, so Plaintiff needed to see endocrinologist. How could she even find time?

She researched and purchased cortisol management supplements as a way to help manage

her levels.

## PROTECTED ACTIVITY

45.    Within the first week of February 2022, Plaintiff raised the incident to HR/Nicole

Vaughn and Jean Ermer/Joe Song, but no action was taken as of March 6, 2022. She

reported the incident almost immediately. She also spoke with Nicole Vaughn/HR. Her

advice was to try to "wait things out" given the fast-approaching expected merger close

on April 7, 2022, and perhaps Sharon or (Plaintiff) would be impacted/job eliminated,

removing both or one of them from the company (in other words, solving Plaintiff's

concern without her/Nicole having to actually do anything). She essentially dismissed

Plaintiff's concerns. On March 8, 2022, Plaintiff received an email from Jean addressing

her resource concerns as she was starting to lose her team members out of concern for the

outcome of the merger. Jean also responded to Plaintiff's concerns about Sharon. Rather

than have Plaintiff's back and have a discussion with Sharon and Plaintiff to address the

behavior (as Plaintiff requested), she was once again told to address it directly with

Sharon on her own.

## ADVERSE ACTION

46.    On March 3, 2022, Plaintiff was yelled at by her boss, Jean Ermer. Jean yelled, "Don't

ask me a question I can't answer!" Plaintiff was taken aback. The question was, whether

there should be any concern that the DTC Tech Latin America and EMEA (Europe,

18

Middle East, Africa) 2021 salary ranges had been adjusted by the merit % for 2022 and shared with Talent Acquisition/HR by her peer, International Compensation Consulting teammates, meanwhile the US/CAN salary ranges have yet to begin the adjustment process, raising concerns of disjointed approaches across-geographies, which has consistently been raised as a point of frustration by global DTC BU SVP of HR, Michele Golden. Plaintiff's question was valid to ask of her manager and purely intended to be a discussion to agree on an approach, not an unprofessional yelling incident of manager to subordinate.

47.    During the six months surrounding the April 7, 2022, WBD merger close from January 1, 2022, through June 2022, Plaintiff lost 5 FTE HC and 1 Project Hire leaving her with only 2 FTE team members.

d.    Mi Chang (direct report leading the WM Technology Office, Compensation Partner Lead), who departed at the end of January 2022 due to frustration caused from lack of sufficient resources (resulting in extreme hours).

e.    Rick Turk (direct report supporting advanced analytics/modeling DTC Tech Talent Framework population), who departed in mid-January 2022. He expressed that he experienced toxic client interactions with Technology/ISP HRBP, Chad Bauer.

f.    Simon Marlow, who departed in mid/late February 2022 (reported to Lisa Komorowski supporting CNN (Comp Partner 1)) due to concerns for "writing on the wall due to Disco[very] merger" and he received an opportunity in tech to work for his dream company.

g.    Lina Jing (Project Hire supporting career level guide work for DTC Tech Talent), who departed in May 2022 out of environment concerns based on messaging from new WBD

leadership, and interactions with Chris Koski. Chris was a Discovery compensation partner/consultant, who helped support the tech talent solutions for D+. (He will be discussed in further detail below.)

h.  David Yu (Comp Partner Plaintiff supported WM Technology Office), who departed due to concerns over future team support and experiences to date per the WM/Discovery transaction, including Chris Koski.

i.  Corey Nelson (Comp Partner II over Sports/ CNN-Digital), who departed in June 15, 2022, citing negative experiences with Chris Koski and concern for the future given how the WM/Discovery transaction had been managed to date.

j.  Angela Spivak (Comp Partner Lead for DTC BU/HBO Max), who resigned in late June, and departed by July 22, 2022, expressing workload concerns, an unclear future of new company, and combative experiences in trying to collaborate with Chris Koski.

k.  Mi Chang, Corey Nelson and Angela Spivak each came from separate brands that were ultimately consolidated under WM. They lived through several transactions to date evolving with the companies as a standalone brand, then as Time Warner, where the brands were brought together under one holding company, to the AT&T acquisition of Time Warner, which created WM, the integration of all the brands (HBO, Turner, WB). Their experiences were very frustrating, sharing feelings of being passed over for key roles while others more favored and less qualified were appointed to roles. They also had concerns that the WM/Discovery transaction would be equally taxing and unfair.

48.  Shortly after the deal closed in April 2022, Plaintiff's shrinking team was required to work with the only Discovery compensation partner team member, Chris Koski (younger, White male). Unfortunately, his disruptive (versus helpful) style was the final factor for

three of Plaintiff's last team departures, who had the most exposure to him. Rather than help, he created more work for Plaintiff and her remaining few team members. He would attend Plaintiff's team meetings inferring that he may be the new lead, replacing her. He would sabotage the integration and harmonization work by withholding Discovery information/data that the team needed to solve for job mapping solutions, cost impact analyses, etc. Legacy Discovery client/HR Business Partners would express concern over delayed deliverables from Chris pre-merger. He went dark for one full week without any mention to Plaintiff or his manager, Scott Hayes/Discovery Compensation, leaving unfinished time-sensitive work to be picked up by Plaintiff and her team.

49.     By June 2022, Plaintiff's direct team was most significantly impacted by the voluntary departures (5 FTEs and 1 Project Hire). Ralph Beidelman, Discovery SVP Global TR, was named as the new WBD SVP, Global Total Rewards, replacing Jean Ermer and Joe Song as Plaintiff's manager/leader.

l.     In early 2022 (prior to deal close), each WM BU was given a target headcount reduction/cost synergy goal. It was explained to Plaintiff and her peer Compensation Leadership Team that due to the high attrition experienced in her direct team, the HC/cost reduction target for the entire TR team had been met; therefore, no other HC would be reduced in other parts of the team. Essentially, Plaintiff bore the brunt of the headcount reductions, saving the remainder of team from having to cut heads.

m.     Jacque Wright (direct peer, Black male, 50), lost no HC/FTE – essentially his entire team has an average 15-year tenure and worked with Jacque his entire career at WB/WM/WBD.

n.    Renu Jeyakumar (peer, Asian/Indian female, younger than Plaintiff (40s)), leader
       for WM Comp Programs, lost one junior HC/FTE (was granted backfill and 2
       additional heads in early 2023). Renu is a peer level, but she has a different
       job/focus than Jacque and Plaintiff.

o.    Scott Hayes (peer from Discovery, White male, younger than Plaintiff (40s) was
       given Executive Compensation role) received one additional HC during hiring
       freeze period. Scott is also a longtime colleague to Ralph Beidelman and Ralph's
       successor.

p.    Julie Paterman (peer from Discovery, White female in UK, younger than Plaintiff
       (40s), who replaced Becky Eshalomi and Natalie Bosch, who took packages and
       left) was named International Compensation & Benefits Consulting, received
       multiple new additional HC (Upon information and belief, Plaintiff believes 5 in
       total) and promoted to Group VP. She has the smallest client group size (1 HR
       SMT (Senior Management Team) and 1 BU/ELT leader) and fewest employee
       population. (Jacque Wright and Plaintiff would each have 3 HR SMT and
       multiple BU leaders/ELT.) Julie does have multiple (more than two) countries.
       This created a lot of questions across all of the global compensation consulting
       team given the perceived unfairness and favoritism (larger teams/resources and
       promotion).

q.    Brian Mullins (peer, White male) leads US and CAN Benefits (health/welfare), as
       VP, Benefits. He is a legacy from WB/WarnerMedia and also worked for Jean
       Ermer for many years.

r.     Laurie Delahanty (peer from Discovery, White, younger female) worked for Ralph previously as a direct report at Discovery. She was a Director at Discovery and was made a VP, Benefits here at WBD. Her scope is very narrow, her focus is retirement/pension US.

50.     In the month of June 2022, several incidents occurred leading to Plaintiff's physical and mental breaking point.

s.     She requested approval from new leader, Ralph Beidelman, for a $75,000 retention bonus to retain the last two departures, Corey Nelson and Angela Spivak (a $150,000 investment in key talent). Both were very long tenured team members with considerable knowledge that were allowed to walk out the door. Plaintiff's request was not approved and she was left to manage her clients with only <u>two</u> employees.

t.     Upon raising concerns about Chris Koski's performance to Ralph Beidelman and Scott Hayes (Discovery compensation team member/now peer, who was the manager of Chris Koski) following multiple unprofessional instances, Plaintiff learned that Chris had been a performance problem employee receiving multiple verbal warnings. This would have been key employee information to share with Plaintiff prior having Chris aligned with her team. While Ralph Beidelman would not approve retention bonuses in hopes to retain her last two key employee departures, Plaintiff was required to manage a problem Discovery employee instead, which only added to the impossible situation she was put in. Plaintiff felt she was being punished for raising her concerns.

u.  Plaintiff asked Jean Ermer and Ralph Beidelman for resources from the other
compensation teams to be shifted/shared or to lift the hiring/backfill freeze given
the extreme circumstances on her team. Neither were supported by Jean/Ralph.
Jean Ermer claimed the other teams under Jacque and Renu were also extremely
busy, yet, still operating with full teams (Renu lost one employee to voluntary
attrition). The exception to the backfill freeze was not granted.

v.  Plaintiff had separate conversations with Jean Ermer and Ralph Beidelman, where
she began to cry while expressing that she had been set-up to fail for a substantial
period of time since joining and the toll it has taken on her and her remaining
employees physically and mentally. Neither Jean or Ralph took responsibility for
her lack of resources or showed any concern. They provided no comfort to
Plaintiff, which was dehumanizing.

51. By July 2022, Plaintiff was left with only 2 team members remaining, and a massive
remit to lead integration for job architecture and compensation harmonization for her
clients, including hyper-focus on integration of WM and Discovery streaming talent,
which was a critical focus area, requiring an accelerated mapping of talent and cost
assessment based on the different compensation strategies for each company. These
populations had a separate, differentiated compensation offering (DTC Tech Talent
Career Framework) which was an additional focus area for Plaintiff's team only – e.g.,
additional initiative to drive/lead.

52. At the eleventh hour, Ralph Beidelman approved a budget for 2 – 4 junior consultants
from Deloitte. Plaintiff was told to only start with 3 consultants and to later assess
whether a fourth was needed. This "temporary solution" will result in substantial work to

select and onboard resources to augment what was now a team of few (Lisa Komorowski and Julie Clowe) and Chris Koski and Plaintiff. This solution was also extremely expensive! Each Deloitte consultant billed $300-$350 an hour. The total cost for their support totaled approximately $2 million. Plaintiff was only asking for $150,000 to save two employees who would have been more effective than the time required to on-board, teach, and manage the Deloitte consultants.

53.    Following a series of panic attacks, the start of unwanted weight loss, and the return hair loss, Plaintiff saw her PCP on July 7, 2022, and was immediately directed to begin a medical leave of absence. This only sent her into further panic as she felt she could not leave immediately Lisa and Julia without the resources onboard – it was a huge undertaking to set up and effectively onboard new people at WBD – the contractor onboarding process is not efficient.

54.    Plaintiff's medical leave of absence began July 25, 2022. Lisa Komorowski was the only remaining senior level member of her team. She was the interim leader in Plaintiff's absence. Now, she was left with one analyst and Chris Koski, and 3 (eventually 4) new Deloitte contractor/consultants, who were not issued WBD laptop computers for several months; and therefore, not able to be very productive or effective initially, only created more anxiety. Two former members of Plaintiff's team, Shimena Terry and Danielle Morton, who had moved to Jacque Wright's team on January 2021, took on the News & Sports BU (Lisa's client group) when Plaintiff was already on medical leave as a shared resource given Lisa had to support all of Technology and Streaming. Plaintiff hated the fact that she had to leave Lisa to manage the impossible in her absence. This weighed

heavily on Plaintiff and only added to the panic she experienced. Plaintiff felt like she was forced into this no win situation, which did not help her symptoms.

## FMLA LEAVE

55. Plaintiff went on medical leave of absence from July 25, 2022, to November 1, 2022. During the leave, she dropped to a very unhealthy 100 pounds (normally she weighs 117), her hair had severely thinned (again). She was having therapy twice a week and saw her PCP regularly/weekly as he dialed in the right dosage for all of the medications she was prescribed. She took anti-anxiety (high dosage), anti-depression and sleeping medication daily with Xanax, as needed, for panic attacks.

56. Due to the medical insurance plan she had (high-deductible given she normally had preventative appointments), most costs were not covered. She was also referred to therapists, most costs were not covered. She has incurred an estimate of $30,000 in medical expenses (excluding the gastroenterology and cardiology testing from December of 2020, which were ordered to understand why she was getting physically ill/vomiting every few weeks during her initial hostile experience with Sharon White while implementing the DTC Tech Career Framework.

57. While Plaintiff was on leave, Chris Koski, the troublesome Discovery team member, exited the company in August/September of 2022. Approval was granted to backfill the role. Plaintiff hired another senior team member while she was on leave (which she should not have been doing per doctor's orders, but she worked behind the scenes out of desperation to try to rebuild the team). Anne Sieh (who worked at Accenture previously), started at WBD on October 19, 2022.

26

## ADVERSE ACTION

58. Upon Plaintiff's return on November 1, 2022, her team was staffed with 3 FTEs and now 4 new Deloitte contractors. She was sharing 2 HC with Jacque Wright to support News/Sports. One of the other 4 frozen roles (Advanced Analytics & Modeling role) since January 2022 was finally opened/posted while she was on leave; however, she was still at a 3 FTE HC deficit when Plaintiff returned from leave, which including Deloitte consultants requiring extra effort to manage.

59. When Plaintiff returned, she was advised by her PCP to only work 50-80% her first few weeks, which barely lasted a couple days given the tremendous amount of work to be done and new team member (Anne Sieh) to help onboard given she started two weeks prior. Plaintiff felt terribly that Lisa Komorowski had to fill in in her absence, and desperately wanted to relieve her workload. During Plaintiff's leave Lisa would occasionally call her in tears. Plaintiff was stepping right back into an equally unhealthy work situation since a reasonable accommodation solution had not been provided by leadership/WBD. Plaintiff tried her best to manage the boundaries. Ralph told her to do whatever she needed to do, but did not offer any solutions, i.e. accommodations. His advice was met without actual support, a failure to accommodate Plaintiff's known disability.

60. The Deloitte consultants were finally starting to make some impact as a Plaintiff returned, but their contracts were set to end on December 15, 2022, so she busily began working on the request for their extension out of desperation because leadership would still not allow her to fill the other 3 frozen FTE roles. Within their last week, the extension was approved but only until January 30, 2023. Given it was approved last minute, each

consultant already had PTO plans in January; however, Plaintiff and team took whatever time they had available given we were launching the extremely busy annual planning season for the first time as WBD.

61.   At the same time in mid-December 2022, Plaintiff learned of HR Business Partners who have been impacted and asked if possible, to bring on a resource to help project manage the WBD Tech Talent Strategy work, which Plaintiff's team needed to solve for as compensation programs were to be harmonized. Plaintiff brought on one impacted resource through March 2023. The amount of work to seek out her own resources to do her job and the administrative legwork were enough to be an additional full-time job. Plaintiff felt there was no care that she just returned from a medical leave of absence. Once again, she was not set-up to succeed. Soon in 2023, the panic attacks returned, which she still managed via medication to this day. She has been on medication for over one year.

62.   Given the massive amount of work the Compensation Team(s) were leading and the continued hiring freeze, in January 2023, Plaintiff requested to extend Deloitte for a second time through end of March 2023. This was a huge effort once again. The administrative process to extend contractors required sets of approvals each time, extensions in Fieldglass systems, which was a nightmare, and painfully slow process with Contingent Worker Management Office ("CWMO"). The team and Plaintiff continued to work extremely long hours, and everyone was burned out. Her continuous requests to leadership and HR, was to unfreeze the roles for her team versus the constant work to beg and negotiate extending temporary resources.

63.     With the looming end of March 2023 roll-off of Deloitte contractors, the team and

        Plaintiff were very concerned about resources. A business case was put forth to Ralph

        Beidelman and Adria Alpert-Romm (Chief People Officer) requesting backfills of

        Plaintiff's remaining 3 frozen roles (since deal closed in April 2022). She had several

        email exchanges from about March 3 to 18, 2023 with HR/Ashley Royal for support in

        securing FTE resources.

64.     On March 18, 2023, Ashley informed Plaintiff that Adria did not approve the full request.

        Plaintiff obtained approval for 1 of the 3 backfills, but the other roles are down leveled to

        the most junior Analyst level, and as contractors/temporary hires, not FTEs.

65.     Following this approval in mid-March 2023, Plaintiff's team was still at a 2 FTE deficit

        (which included the four temporary Deloitte consultants), yet given added work to

        manage the administration of contractor work and now an outside placement agency! The

        experience was awful, massive administrative/system red-tape, and constantly losing

        contractor candidates as the agency was not moving quickly.

66.     The entire situation became so frustrating that one of Plaintiff's direct reports, Anne Sieh,

        on March 13, 2023, chose to go directly to Ralph Beidelman to make her own plea for

        resources given the desperation felt across the team.

67.     In the meantime, Plaintiff's peers' compensation teams were receiving additional heads

        in addition to unfreezing previous backfills. For example, Renu Jeyakumar (younger,

        Indian female), who leads Compensation Programs, was now up 2 FTEs beyond the team

        resources at deal close.

68.     Then, Julie Pateman (legacy Discovery, White female, and younger than Plaintiff), who

        is based in London/UK was given the International Compensation & Benefits role, and

provided multiple new headcounts for international compensation and benefits consulting team and promoted to Group VP. Her total team size has become 40 headcount supporting compensation and benefits international (Becky Eshalomi and Natie Bosch were the compensation and benefits leads for WM International and had a total team of approximately 15 – 18 FTEs). In fact, while Plaintiff's small team suffered, Julie was able to build up her team. With her promotion to Group VP, she received two VP roles under her. Julie is very close to Amy Girdwood, who is a very senior HR leader from legacy Discovery. Amy carries a lot of weight/influence. She has close working relationships with Global Streaming and Interactive business leader, JB Perrette, and Chief People Officer, Adria Alpert-Romm. So, when Julie needed help, she was promoted, received an increase in HC and received 2 VPs. This was extremely unfair to Plaintiff as her role carries the largest portion of the employee population, key growth areas for WBD and four ELT business leaders with three HR/P&C SMT leaders than Julie's, yet she is given a team that far outnumbers Plaintiff's at 40. (Noting that benefits is part of her remit.)

69. The two VPs under Julie are two White, younger women, Karen Kinzett-Evans and Kate Brenneke. Karen and Kate each have 15 people under them while Plaintiff only had 4 FTEs and still at a 3 FTE deficit (with only the Executive Director title). Prior to being given the VP title, Kate was a contractor who was not even a full-time employee and focused only on compensation projects. While Karen's role focuses on benefits. Yet, Plaintiff and her team were expected to not only do their "day job" but also take on compensation projects, including the high visibility Tech Talent harmonization effort.

70.    Plaintiff's team was aware of how the other teams under Ralph were/are staffed, which added to the continuous frustration as her team worked feverishly to keep up with the workload while continuing to have to operate at a significant resource deficit. Plaintiff's team has asked questions about why their roles have not been elevated, what criteria was used to level the two VP roles on the international team, or why they were not considered for the larger roles.

71.    As the unfair and seemingly impossible resource/capacity situation continued through the summer 2023, Plaintiff's last attempt at a solution was to propose a US/CAN Compensation Consulting team reorganization design that addressed the "spans and layers" initiative expected to be met across the company, by removing the VP Compensation layer (her layer) on the US/CAN compensation consulting team in order to fund the additional heads needed to finally somewhat adequately staff the consulting team that was under her. This organization design proposal would also provide a cleaner alignment of the compensation partners to each HR Senior Management Team ("SMT") member allowing for a more seamless and direct partnership. Plaintiff felt she had no other option but to make this proposal in order to provide her team what they needed as she was not given enough support despite her several pleas. Her team was the smallest but dealing with some of the more complex client groups. WBD made her work environment so hostile that she had become the sacrificial lamb and it should not have been this way. Plaintiff believes she was manipulated and put into an extremely untenable situation. Rather than receiving recognition and reward for the effective work her small, but mighty team was driving; Plaintiff and her felt we were being punished.

72.     The proposal was made on August 22, 2023, to Ralph Beidelman. HR (Ashley Royal and
Michiko Sheppard) agreed with the proposed reorganization design for the US/CAN
Compensation Consulting Team. Jacque Wright was included in the meeting to discuss
the team reorganization and compensation partner/consulting team realignment to HR
SMT.

73.     Ralph took the proposal into consideration and scheduled a follow-up call for August 24,
2023, to share his response after he discussed it with Adria Alpert-Romm.

**ADVERSE ACTION**

74.     On August 24, 2023, Ralph accepted the team reorganization proposal as a solution to
(finally) fund more resources for Plaintiff's team and address the "spans and layers"
effort expected across the company. Plaintiff was being discriminatorily terminated based
on her race, gender and disability. Ralph offered severance to Plaintiff and Jacque in
exchange for a six month stay period (through March 1, 2024). Allegedly, Jacque was
eligible for a 12-month severance package due to his 17 year tenure. Plaintiff did not quit
her employment and did not request severance. Plaintiff was told she was only eligible
for 26 weeks, or six months, severance package (despite her different interpretation of the
Severance Plan currently in effect). Plaintiff's interpretation of the Severance Policy
would suggest a 36-week severance package. The Severance Plan currently in effect
indicates that there is a minimum severance of 26 weeks PLUS 2 weeks for every year of
service (4 years) and a 2 week base line. Adding insult to injury, Plaintiff was offered less
than what the Severance Plan provides yet Jacque Wright received full value under
Severance Plan. (Plaintiff is currently appealing the denial of her ERISA claim for
severance benefits). This was clearly an adverse and discriminatory action based on her

race, disability, and gender. Further, a total disregard for her mental and physical health and well-being as she had returned from a medical leave of absence ten months ago.

75. With almost one-year since Plaintiff's medical leave of absence, her physical and mental well-being is of serious concern for Plaintiff and her family. The grueling and unfair demands of her small team have continued to take a toll on her while having remained on various medications and weekly therapy sessions for over a year to continue managing through a toxic work environment.

76. From August 24 to September 22, 2023, there were various discussions between Plaintiff and Ralph or Plaintiff and HR/Ashley Royal. She expressed the serious mental/physical concerns that she had based on a requirement for her to stay through March 1, 2024 (six months). Her hair had begun to fall out in clumps again due to the stress and she began feeling similar to when her cortisol levels were extreme requiring that she return to taking to supplements to help regulate. She was completely drained, and had chronic fatigue, yet she could not sleep well, such that she could not show up for her own family as she should.

77. Plaintiff expressed to Ralph and Ashley/HR her well-being concerns. When discussing these concerns with Ashley only, her response was, "Yes, I know Elle, I have heard you say this a million times." Plaintiff left the discussion feeling dismissed, desperate, and without support for her well-being despite the history and medical leave of absence caused by the circumstances and environment in which she was required to operate. All the while Plaintiff continued to lead her team with impactful contributions to ensure the success of the critical work they were driving.

78.     On September 13, 2023, Plaintiff drafted a recap email to Ralph Beidelman summarizing
        their live discussion, describing her willingness to remain with the team through
        December 31, 2023 (four months stay period) in order to focus on filling and onboarding
        the now 5 total (unfrozen backfills and new) FTEs to ensure her team would be set-up for
        success given her job elimination. She would also continue leading the team through the
        launch of the new WBD Global Job Architecture (finally) and the annual planning
        process preparation for the first harmonized cycle, in exchange for a retention bonus
        equivalent to a prorated amount of the offered six-month severance for a six month stay
        period (e.g., four months of the six month severance), which seemed reasonable and very
        cost conservative to the company. Despite Plaintiff's frustrations with her hostile work
        situation and the lack of support, especially from Ralph, Plaintiff has remained cordial,
        professional, and cooperative as she did not want further retaliation to occur. However,
        Ralph outright disagreed with her proposals.

79.     On September 19, 2023, Plaintiff met Ralph and her peers in person for the first time in
        Atlanta. On September 20, 2023, Ralph asked her for an update regarding a decision on
        his offer/proposal. Plaintiff reminded him of her medical leave of absence because of the
        untenable situation she was put in by him and the Company. Plaintiff stressed that she
        was the primary provider for her family and that she did not feel healthy even after
        returning from FMLA leave due to the continued hostile work environment and
        impossible work situation. It was hard for her to admit as she had never experienced this
        before in her career, including when Plaintiff was working in more complex, high
        demand positions. Plaintiff struggles to inconvenience her clients or her team, even when
        at her own expense. Plaintiff expressed this to Ralph. However, Ralph told her to think

about his offer a couple more days. Given Ralph's direct report team was together in person in Atlanta, Plaintiff did not feel comfortable holding firm to her request while within the direct line of vision to her peers out of concern for the awkwardness and disruption as they all had another day together.

## ADVERSE ACTION

80. It is also important to highlight that Ralph has been in Los Angeles, California many times, which is where Renu and Jacque (Plaintiff's peers) are based. Scott (Plaintiff's peer) has been to Los Angeles and New York City a few times with Ralph. Ralph has also been to London several times in the past couple of years, which is where Julie Pateman (Plaintiff's peer) and her directs are based. However, Ralph had never been to Atlanta, Georgia to meet Plaintiff in person until September 19, 2023, which was the first time Plaintiff had ever met him live. In contrast, others have met in person and with Ralph in person several times prior. WM/WBD's main hubs and locations listed for hiring are New York City (headquarters), Los Angeles, and Atlanta in the US. Plaintiff is the only Atlanta direct to Ralph (very recently (September 2023) he took on the Mobility function and that leader is in Atlanta). London is the main location outside of the US. Interestingly, geographically speaking, Plaintiff is located closest to Ralph (North Carolina), yet Plaintiff was the only one who had not met with him in person until September 19, 2023. Plaintiff felt like Ralph continually put her at a disadvantage and being the only one of her peers who had not met him in person until September 19, 2023 (well over a year since he became her manager), was another example of his discriminatory treatment of Plaintiff compared to her peers.

35

81. Further, Scott and Renu have been to the New York office. While Scott's role has been over Executive Compensation and Compensation Committee meetings have been held there, Renu was allowed to travel for one of the Comp Committee meetings in New York simply because she wanted the exposure.

82. Discussions between Ralph and Plaintiff continued through September 22, 2023 (progress was delayed given Ralph held his first in person Leadership Off-Site in Atlanta). Plaintiff had agreed to help with planning/logistics, and she kept her commitment to avoid an awkward situation.

83. Ralph was only willing to offer 1 month of the severance payout in exchange for Plaintiff staying through December 31, 2023 (four months). Plaintiff expressed that this felt extremely unfair and did not follow any retention guidance or precedent set forth to date for others impacted. Based on her experience in handling these critical talent retention situations frequently for her client groups, and her knowledge of how other executives have been treated in the same reorganization situations, Plaintiff was being treated very unfairly and essentially left with no choice but to leave without any severance or eligible prorated bonus as an impacted employee, out of concern for her own well-being. Ralph's response was, "No," and that he would only give Plaintiff 1 month. Plaintiff was extremely frustrated with Ralph's unfair treatment and responded that his ask of her did not even follow retention award guidance for key/critical talent. The guidance is 1-2 weeks of time per month asked to stay with key talent leading critical work receiving the upper end, 2 weeks. In fact, people would ask for more and if they were favored enough, it would be approved. However, Plaintiff was given the lowest end of guidance when most key talent leading critical work got 2 weeks or more per month! Once Plaintiff

called out Ralph on the unfair retention bonus treatment, he only went from 1 to 2 months of pay instead of the 4 months requested – again, still less cost than the severance would be.

84. Out of feeling pressured, on September 20, 2023, Plaintiff mentioned possibly considering March 1, 2024, only with limited availability in January and February of 2024 focusing on the transition to Scott. Ralph was not amenable because compensation planning occurs during those months, and expected that transition would be done at the end of February. Plaintiff was getting nowhere with Ralph, and treated very unfairly compared to others at her level. Frustrated, <u>Plaintiff told Ralph that after their September 20, 2023 discussion she did think about it more and she would not accept any less than what she was asking (this conversation occurred on September 22, 2023). However, Ralph's blunt response was that her last day would be October 2, 2023 then.</u>

85. At that point it was September 22, 2023, and the delay for agreement brought Plaintiff one month closer to her earned WBD annual bonus, which requires an employee to be active on December 31, 2023, to receive their annual bonus. Her bonus at target was her $290,000 base salary multiplied by her 30% target = $87,000 (and ideally more as a top performer).

86. Impacted employees via job elimination/reorganization are eligible for their prorated annual bonus based on term date in the year, as long as they have worked 180 days in the fiscal year. Plaintiff is an impacted employee based on the memorandum Ralph drafted as his team announcement, described below.

87. Ralph was not willing to agree to Plaintiff's stay proposals. She felt he manipulated her situation to force her into a no win situation no matter what she did.

88.    On Monday, September 25, 2023, Ralph drafted a Compensation Consulting Team

Reorganization Announcement memorandum for HR SMT/P&C explaining he had

chosen to "streamline his senior management team" and "as a result, Jacque Wright and

[Plaintiff] will be leaving the company." This memorandum draft was sent to his senior

management team for review and verbally shared with HR SMT/P&C Leadership in a

meeting on Tuesday, September 26, 2023. Per this memorandum, Plaintiff did not resign

from her employment, rather she was being terminated/eliminated by WBD.

89.    Plaintiff was not being offered severance nor any portion of her 2023 annual bonus that

she was eligible for because they allegedly considered her to be a resignation since she

felt she could not physically/mentally remain for six more months. However, Ralph

communicated her departure as a reorganization job elimination. No employer can make

an employee resign.

### ADVERSE ACTION

90.    In contrast, Jacque Wright's severance package is for 12 months of severance. He

ultimately agreed to stay through March 1, 2024.

91.    As a result of this announcement, Plaintiff sent an email to Ralph Beidelman and Ashley

Royal on September 25, 2023, stating that she would not be resigning and never wanted

to resign rather she simply wanted the resources needed to carry out the demands of her

job.  Ashley Royal scheduled a meeting with her on September 28, 2023, to discuss.

Plaintiff stated that, "I am not resigning, I never intended to resign." This email caused a

pause in the announcement memo being formally sent to HRLT/P&C Leadership for

cascade to their respective teams.

92.     Ralph also canceled a transition meeting scheduled on September 29, 2023, with Plaintiff
        and Scott Hayes (White male, younger than Plaintiff), who was described as taking over
        Plaintiff's role upon her departure on October 2, 2023. The announcement also
        mentioned Scott's promotion to Group VP as part of the "team streamlining." The
        announcement memorandum included an illustration organizational chart of Plaintiff's
        team with Scott's name shown as replacing her. Scott is not the most qualified to take
        over Plaintiff's role.  However, this does indicate WBD's discriminatory intent to replace
        her with a younger male employee.

## PROTECTED ACTIVITY

93.     On Sunday, October 1, 2023, Plaintiff sent a discrimination claim email notification to
        Ralph Beidelman and Ashley Royal. As a result, the discussion invite via Zoom for
        Monday, October 2, 2023 (which was sent to Plaintiff on Friday, September 29, 2023)
        with Ralph and Ashley, was canceled.

94.     On Monday, October 2, 2023, Ashley Royal acknowledged Plaintiff's discrimination
        claim email, and informed Plaintiff the People Relations would be reaching out to her
        "about your concerns."

95.     Plaintiff received a meeting invite from People Relations ("PR") later that afternoon. The
        meeting was set for Tuesday, October 3, 2023, at 12:30 pm ET. Plaintiff responded to
        this meeting invitation by informing PR that she would not be discussing her concerns
        with them per legal advisement. They responded by saying "…your lack of cooperation
        limits our ability to investigate." They later offered Plaintiff the name and contact
        information for the company attorney to provide to her legal counsel, which Plaintiff
        confirmed she wanted. This information was provided to Plaintiff on October 4, 2023.

96.    On October 4, 2023, Plaintiff had a 1:1 with Ralph Beidelman, which was strictly a work discussion. Nothing of note occurred.

97.    During Plaintiff's entire tenure at WM and WBD, no performance ratings were done. She was the recipient of a "special Kicker Bonus" during the annual planning cycle of 2021 intended for top/critical talent. She also received two separate and consecutive retention bonuses, one awarded in 2021 for stay through merger close following April 2022 (paid in June 2022, upon information and belief). A second was awarded after returning from medical leave (November 3, 2022) as most of the compensation team was given a stay/retention bonus due to the heavy lift in compensation for the harmonization work, which was paid out on June 30, 2023. Given Plaintiff's impossible workload and still getting paid less for her work compared to Jacque's, this bonus was actually lacking.

98.    Plaintiff received unsolicited very positive feedback for her work and leadership of a small, but mighty team that made a noticeable impact to the business/client groups she and her team support. She led/leads high visibility and critical work within the tech/streaming space, in particular.

99.    Despite the positive feedback, WBD showed no interest in Plaintiff's future with the company or her progression upward or laterally. There was no effort to understand her previous work experience, which began as a consultant for approximately 10 years followed by a transition into corporate roles with mostly large, complex global companies. In fact, there were no career conversations at all, which was very odd to her. In one of her very first conversations with Ralph Plaintiff mentioned her interest to expand beyond compensation and her career goal to work abroad. There was no follow-

40

up ever. WBD's lack of interest in her future is a clear indicator that her days were numbered there.

## ADVERSE ACTION

100.  On October 9, 2023, Ralph shared the announcement regarding changes he would be making on the Compensation leadership team. This announcement formally informed Ralph's direct reports and Plaintiff's team of her "departure" from WBD on March 1, 2023. The announcement also indicated that "Scott Hayes [White, younger male] will be overseeing all client consulting support and executive compensation supporting the Compensation Committee. Renu Jeyakumar [younger Asian female] will be overseeing the design and administration of WBD's annual planning process, ICP, and equity programs. Julie Pateman (younger female) will continue to oversee international compensation and benefits." Thus, Plaintiff (and eventually Jacque Wright, Black male, age 50) would be replaced by a White younger male worker. As stated above, Scott was not the best person for the role, but benefited from WBD's bias as he was given the Group VP role. The Group VP title has been applied across WBD HR/P&C without following intended (and fair/consistent) criteria, instead it is more of a favoritism title, which comes with higher overall pay.

101.  Further, the announcement reads as if Plaintiff was terminated/eliminated. Many colleagues/partners were shocked by the announcement as Plaintiff was a strong partner and they did not understand why she was being eliminated.

102.  On or about the week of October 16, 2023, Plaintiff's team discovered that Scott and Renu (both younger than Plaintiff) were already promoted as they were both designated as Group VPs in the systems despite not performing their new roles as Plaintiff was still

working in the role requiring long hours to continue managing to heavy work demands. With their Group VP designations, they likely are also enjoying an increase in their base salary and equity despite not yet doing any of the work. In fact, Plaintiff was told she could not begin transitioning work until February of 2024.

103.    The early promotion of Renu also underscores WBD's discriminatory preference for younger workers as Plaintiff was now the only member of the Compensation leadership team that was not carrying a VP title and was the only direct report to Ralph with an Executive Director. Further, Plaintiff is several years Renu's senior and she has far less experience and expertise than Plaintiff. Yet, she was freely given the GVP title when Plaintiff had to fight for a title like her peers since the very beginning and still does not have one that accurately reflects her level as VP. This has caused new client groups to question her role/experience prior to working with Plaintiff because of her title in the system, which makes it hard to do her job at times. This is clearly retaliation for her complaints.  As Plaintiff explained above, title is very important in this company and the media/entertainment industry as a whole (it is a symbol of importance and authority).

104.    On November 7, 2023, Plaintiff attended via Zoom a Townhall that Adria Alpert-Romm hosted for all of HR all over the world. The Townhall took place at the WBD headquarters in New York City with two layers below Adria invited, which would include Plaintiff's level and her peers' levels. When Plaintiff attended the Townhall via Zoom, Plaintiff saw, much to her surprise, Renu Jeyakumar and Scott Hayes on the video sitting in the room in New York City where the event was held. In addition, Julie Pateman, who is based in London, was there as well. Plaintiff was not invited to attend in person. As described above, Plaintiff had not been authorized to travel while Renu and

Scott (both younger than Plaintiff) have been allowed with this event as the most recent occurrence. Renu, Scott, and Julie's presence does not make financial sense as both are located out of state – Renu in California and Scott from Tennessee and in Julie's case, out of the country. Being where several of Plaintiff's key stakeholders were present would have been ideal for Plaintiff to tackle the WBD harmonization effort of premium tech talent and beyond. Again, making Plaintiff's ability to carry out her role harder. While Scott and Renu have been promoted prematurely to Group VP, they had not actually started their roles while Plaintiff continued to work a demanding schedule in the role Scott would assume with merely an Executive Director title and she had to fill seven HC all while managing during the busiest time of the year for the Compensation/TR team. WBD's disparate treatment based on her age has only continued despite her reports of discrimination.

105. Plaintiff was unlawfully terminated from her employment without cause on March 2, 2024.

106. Plaintiff was required to work in a hostile/toxic environment while under duress caused by long hours due to lack of sufficient resources and harassment/discrimination as she described above. Plaintiff was constantly requesting additional support/fighting for her team to be properly staffed to carry out responsibilities/demands of roles in support of her assigned client groups – this occurred while at WM and became significantly worse as WBD. The reasons for Plaintiff's untenable stress should not exist. Despite the toxic environment surrounding her team, she has created a very open and supportive environment for her team. Her team often expressed the appreciation for the safe space

on a regular basis suggesting it is the reason why they stayed/joined the team despite the team's many unfair challenges.

107.    Currently, the Board of Directors of WBD is made up primarily of White males, with only three women, two Black women and one Asian woman. There is no White female representation on the Board.  Further, the executive leadership team at WBD is a majority White males. There are only three women, two are Black and one is White.  All three of the women are legacy Discovery. This indicates that from the top, White women are not adequately represented in such a large company.

108.    Defendant WBD's discrimination based on Plaintiff's age and other older workers continued:

w.    Most recently, a younger white male, who was a legacy Turner employee, abruptly resigned in November 2023 after switching to CNN from Studios/Networks role as SVP HR. His resignation was announced in early November and he left by end of year (last day January 5, 2024). He was expected to be the successor to the Chief People Officer of WarnerMedia. He chose to resign on his own, but he is receiving severance. Upon information and belief, Plaintiff believes he will receive severance for two years as he had a contract. He receives over $11,000 a week (about $44,000 a month), even though he started a new job immediately as a Chief People Officer. So, he is receiving a very generous severance while working for another employer, despite choosing to voluntarily to leave the organization. While Plaintiff will only be given the minimum severance and was forced out.

44

x.     A younger female executive, Alex MacCallum, returned to WBD in the same role that was "eliminated" following the pulling of CNN+. She had been receiving severance since her elimination in April 2022. She began working with the Washington Post in the summer and has continued to receive severance (about $50,000 a month). New CNN leadership recruited her back to CNN and agreed to continue paying her WBD severance while she stayed with the Washington Post until March when she joined WBD again in same role, elevated a level higher, and substantially more money than when she left, plus the severance she received/receiving all the while. The severance plan/contract states these monies are to be repaid. Plaintiff worked with WBD on Alex's offer to return to WBD/CNN. The SVP of HR for CNN at the time asked if an exception was possible to not require Alex to repay those monies received from WBD while working at the Washington Post, as an extra incentive to come back. Plaintiff instructed him that this was against policy and he would need to escalate to Adria to go against policy. Adria approved the exception in December 2023 such that not only did Alex not have to repay, but she agreed to continue paying her WBD severance while she was allowed to remain working with the Washington Post until March 2024, so she could receive a bonus from the Washington Post as well. In contrast, Plaintiff will only be given the minimum severance and was forced out.

y.     Kristin Gomez, has been a VP of HR, for Max (WM/Warner Bros) for over 14 years. In the later part of 2023, key client groups were taken from her (Global Product Management) and given to a much younger, less experienced, female

legacy Discovery employee. This woman, (Hannah Lucille) was then promoted from VP to Group VP. Kristin approached her manager (one of several younger, male, SVP HR appointments that was legacy Discovery), expressing her discontent, with minimizing her role. She negotiated a deal to eliminate her VP role, downgrade it to a Director role since the bulk of the role went to Hannah, which essentially eliminated her VP level role triging severance for her. She was allowed to continued working through March 31, 2023 in an as needed capacity, while the now downgraded role was filled by a younger white male.

z.    Recently, Scott Hayes (white, younger male), who replaced Plaintiff, was granted approval to fly in all of Plaintiff's former direct reports to Los Angeles/Burbank for all to be together in person. However, Plaintiff was consistently denied approval to bring her team/directs together in one location for the entirety of her tenure at WM or WBD. Despite the most significant cost containment targets delivered to all of WBD by the CFP in February 2024 prior to Plaintiff's departure, and despite Plaintiff's many requests for approval to bring her team together in New York City, Atlanta, or Los Angeles/Burbank, Ralph never allowed Plaintiff to meet her team members or direct reports (or clients) in person. However, less than two weeks since Plaintiff's last day, Scott Hayes, was given approval to bring the entire team to Los Angeles (a very high cost location) the week of April 15, 2024 when cost reduction is of the utmost priority currently. This is further evidence of favorable treatment toward younger direct reports of Ralph.

46

109. Plaintiff was unlawfully discriminated against on a continuous basis during her employment because and substantially because of her race, sex, gender, age, and disability. WBD discriminated against Plaintiff in the terms, conditions, and privileges of employment on account of her protected statuses. WBD has established a continuous pattern and practice of discriminating against White, female, older, and/or disabled employees in favor of other similarly situated employees not part of the same protected class(es). These unfair behaviors are especially obvious within the Global TR team lead by Ralph, Plaintiff's manager.

110. The emotional impacts of the discriminatory treatment, in addition to already severe manifestations described above, Plaintiff received while working at WBD have severely affected her marriage given the extreme hours she was working to keep up with lack of resources at work, missing school activities or events at school/sports for her children, and forgetfulness with certain personal deadlines. Plaintiff has never experienced this before working for WBD. She was also prescribed sleeping medication as she was barely sleeping for several months straight leading to the mental breakdown/panic attacks. She was diagnosed with PTSD (Post Traumatic Stress Disorder F43.10) and Generalized Anxiety Disorder (F41.1) with Depression and Insomnia, and participates in weekly therapy for chronic adjustment disorder caused by anxiety and depression due to her hostile work environment and discriminatory treatment by WM and WBD.

111. On February 29, 2024, Plaintiff sent a letter, through the undersigned, to the Plan Administrator for the Warner Media, LLC U.S. Severance Plan regarding her entitlement to thirty-six weeks (36) of severance benefits pursuant to the plan language. In addition, Plaintiff made a claim for ERISA 502(a)(3) as the Plan Sponsor and Plan Administrator

materially misrepresented the terms of the plan benefit Plaintiff is entitled to. Specifically, the Plan Sponsor and Plan Administrator informed Plaintiff verbally and in writing that she was only entitled to 26 weeks of severance benefits. Such misrepresentation violated the terms of the plan document.

112.   On March 6, 2024, Ralph Beidelman, Administrator, Warner Media, LLC U.S. Severance Plan, as well as Plaintiff's former supervisor, sent a letter acknowledging receipt of the February 29, 2024 letter. Plaintiff was informed that a "full and fair review" of Plaintiff's claims would be sent by May 30, 2024.

113.   On March 12, 2024, Shane L. Johnson, on behalf of the Administrative Committee, wrote in response to Plaintiff's February 29, 2024 letter asserting a claim for severance benefits. The Administrative Committee denied Plaintiff's claim for severance benefits pursuant to ERISA Sections 502(a)(1)(b) and (a)(3).

114.   On April 19, 2024, Plaintiff made an ERISA 502(c) document request.

115.   On May 3, 2024, Plaintiff, through the undersigned, requested a timely administrative appeal of the Administrative Committee's denial of Plaintiff's claim pursuant to ERISA.

116.   On June 27, 2024, Shane L. Johnson, Member of the Administrative Committee, wrote in response to Plaintiff's May 3, 2024 letter appealing the denial of Plaintiff's claim for severance benefits under the Warner Media, LLC U.S. Severance Plan. The Administrative Committee denied Plaintiff's claim for severance benefits pursuant to ERISA Sections 502(a)(1)(b) and (a)(3). Further, their letter was to be regarded as a final decision on review within the meaning of ERISA Section 503.

## CAUSES OF ACTION

## COUNT ONE: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

117.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 116, as if fully set forth herein.

118.   Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her race, which is Caucasian.

119.   Plaintiff was repeatedly treated differently than her similarly situated non-Caucasian coworkers including but not limited to:

aa.   A sudden and unilateral increase of the remit/scope of her role as "Compensation Partner Leader" after she accepted the position. Thus, her new role became much larger role than the one she had originally accepted when her peers, Jacque Wright (Black male) and Becky Eshalomi (Black female), did not experience such a substantial increase;

bb.   She was paid much less than her peer Jacque Wright despite doing more work;

cc.   Despite having a larger remit, Plaintiff had less headcount in comparison to her peers;

dd.   Sharon White (Black female), SVP of HR for WarnerMedia Technology Office ("WMTO") targeted Plaintiff speaking disparagingly about Plaintiff and refusing to work with her. When Plaintiff raised this to her supervisor, Jean Ermer, and Joe Song, SVP TR, Talent Management, Talent Acquisition (Jean Ermer's manager), Plaintiff was met without support, and left to fend for herself. Further, her supervisors not only allowed the bullying, but actually enabled it by participating

49

in additional scrutiny whereas Plaintiff's peers did not experience this;

ee.     Plaintiff's title was lesser in comparison to her non-Caucasian peers;

ff.     Plaintiff has been forced to endure an untenable workload despite her unanswered/inadequately addressed pleas for help;

gg.     Plaintiff was constantly put at a disadvantage by her supervisors;

hh.     Instead of receiving the additional resources she needed, Plaintiff was forced to manage a problem employee, Chris Koski;

ii.     Plaintiff was not allowed to attend events that others were allowed to attend;

jj.     Plaintiff was terminated, which allowed for the promotion of Renu Jeyakumar (younger Asian/Indian female);

kk.     Plaintiff will receive the minimum amount of severance per the Severance Plan in comparison to Jacque Wright (peer).

120.    Defendant WBD's conduct, by and through its agents and employees, including without limitation Ralph Beidelman, Jean Ermer, Joe Song, Nicole Vaughn, and Sharon White at Defendant WBD, in treating the Plaintiff in a manner unequal to other non-Caucasian employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of the Title VII.

121.    The discriminatory acts of Defendant WBD as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

122.     As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT TWO: RACE DISCRIMINATION UNDER 42 U.S.C. § 1981

123.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 122, as if fully set forth herein.

124.   Defendant WBD has unlawfully and willfully discriminated against the Plaintiff substantially because of her race as set forth above with regard to the terms, conditions and opportunities of her employment in violation of 42 U.S.C. § 1981.

125.   Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her race, which is Caucasian.

126.   Defendant WBD has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of 42 U.S.C. § 1981 as it took adverse actions as set forth above against the Plaintiff, who is Caucasian, who was qualified for her position and was performing in exemplary fashion at the time she was terminated.

127.   As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT THREE: RACE DISCRIMINATION UNDER NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296

128.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 127, as if fully set forth herein.

129.   Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her race, which is Caucasian.

51

130.    Plaintiff was qualified for her position and was performing in exemplary fashion at the time she was terminated.

131.    Plaintiff was repeatedly treated differently than her similarly situated non-White/Caucasian coworkers including but not limited to:

ll.    A sudden and unilateral increase of the remit/scope of her role as "Compensation Partner Leader" after she accepted the position. Thus, her new role became much larger role than the one she had originally accepted when her peers, Jacque Wright (Black male) and Becky Eshalomi (Black female), did not experience such a substantial increase;

mm.    She was paid much less than her peer Jacque Wright despite doing more work;

nn.    Despite having a larger remit, Plaintiff had less headcount in comparison to her peers;

oo.    Sharon White (Black female), SVP of HR for WarnerMedia Technology Office ("WMTO") targeted Plaintiff speaking disparagingly about Plaintiff and refusing to work with her. When Plaintiff raised this to her supervisor, Jean Ermer, and Joe Song, SVP TR, Talent Management, Talent Acquisition (Jean Ermer's manager), Plaintiff was met without support, and left to fend for herself. Further, her supervisors not only allowed the bullying, but actually enabled it by participating in additional scrutiny whereas Plaintiff's peers did not experience this;

pp.    Plaintiff's title was lesser in comparison to her non-Caucasian peers;

qq.    Plaintiff has been forced to endure an untenable workload despite her unanswered/inadequately addressed pleas for help;

rr.    Plaintiff was constantly put at a disadvantage by her supervisors;

ss.     Instead of receiving the additional resources she needed, Plaintiff was forced to manage a problem employee, Chris Koski;

tt.     Plaintiff was not allowed to attend events that others were allowed to attend;

uu.     Plaintiff was terminated, which allowed for the promotion of Renu Jeyakumar (younger Asian/Indian female);

vv.     Plaintiff will receive the minimum amount of severance per the Severance Plan in comparison to Jacque Wright (peer).

132.    Defendant WBD's conduct, by and through its agents and employees, including without limitation Ralph Beidelman, Jean Ermer, Joe Song, Nicole Vaughn, and Sharon White at Defendant WBD, in treating the Plaintiff in a manner unequal to other non-Caucasian employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296.

133.    The discriminatory acts of Defendant WBD as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

134.    As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT FOUR: RACE DISCRIMINATION UNDER NEW YORK CITY HUMAN RIGHTS LAW § 8-107

135.  Plaintiff repeats and realleges the allegations of Paragraphs 1 through 134, as if fully set forth herein.

136.  Defendant WBD has unlawfully and willfully discriminated against Plaintiff substantially because of her race as set forth above with regard to the terms, conditions and opportunities of her employment in violation of New York City Human Rights Law § 8-107.

137.  Defendant WBD has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of New York City Human Rights Law § 8-107 as it took adverse actions as set forth above against the Plaintiff, who is Caucasian and White, who was qualified for her position and was performing in exemplary fashion at the time she was terminated.

138.  Defendant WBD's termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

139.  As a result of the Defendant WBD's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT FIVE: AGE DISCRIMINATION IN VIOLATION OF ADEA

140. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 139, as if fully set forth herein.

141. Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her age.

142. Plaintiff was repeatedly treated differently than her similarly situated younger coworkers including but not limited to:

ww. Plaintiff's younger peers were treated far more favorably in comparison to her including being given additional headcount and ability to backfill when Plaintiff was denied despite having a larger remit;

xx. Renu Jeyakumar (peer of Plaintiff, Asian/Indian female, younger) was able to backfill a junior FTE and given 2 additional head counts ("HC") in early 2023 while Plaintiff was not approved to fill all backfills or additional head counts to handle the increased workload from merger/larger company;

yy. Scott Hayes (peer and eventually Plaintiff's replacement, White male, younger) received one additional HC during hiring freeze period. He would also be prematurely promoted to Group VP replacing Plaintiff, while Plaintiff continued to carry out the role for 6+ months and filling the seven HC that were finally approved upon her termination;

zz. Julie Paterman (peer, White female in UK, younger) who has the smallest client group size and fewest employee population received multiple new additional HC and was promoted to Group VP. With Julie Paterman's promotion to Group VP,

55

she also received two VP roles under her, Karen Kinzett-Evans and Kate
Brenneke, both younger. Karen Kinzett-Evans and Kate Brenneke each have 15
people under them while Plaintiff only had 4 FTEs and is still at a 3 FTE deficit at
such time (with only the Executive Director title) and a significantly larger
scope/remit;

aaa.  Plaintiff was terminated, which allowed for the promotion of Renu Jeyakumar
(younger Asian/Indian female) and Plaintiff would be replaced by a younger
employee, Scott Hayes;

bbb.  While Plaintiff fought for her title, Scott Hayes would be prematurely promoted
and allowed to enjoy the benefits of his title without doing any of the work, which
Plaintiff continued to do and had to fill seven HC all while managing during the
busiest time of the year for the Compensation/TR team.

143.  Defendant WBD's conduct, by and through its agents and employees, including without
limitation Ralph Beidelman at Defendant WBD, in treating the Plaintiff in a manner
unequal to other younger employees as described above, discriminatorily denied Plaintiff
equal treatment on the basis of age in violation of the ADEA.

144.  The discriminatory acts of Defendant WBD as described above were intentional and were
substantially motivated on the basis of Plaintiff's age.

145.   As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to
suffer damages and losses including, but not limited to, reputational harm, lost wages,
lost employment benefits, emotional distress, and Plaintiff has incurred and will continue
to incur attorney's fees, expenses, and costs.

56

## COUNT SIX: AGE DISCRIMINATION UNDER NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296

146. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 145, as if fully set forth herein.

147. Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her age.

148. Plaintiff was qualified for her position and was performing in exemplary fashion at the time she was terminated.

149. Plaintiff was repeatedly treated differently than her similarly situated younger coworkers including but not limited to:

ccc. Plaintiff's younger peers were treated far more favorably in comparison to her including being given additional headcount and ability to backfill when Plaintiff was denied despite having a larger remit;

ddd. Renu Jeyakumar (peer of Plaintiff, Asian/Indian female, younger) was able to backfill a junior FTE and given 2 additional head counts ("HC") in early 2023 while Plaintiff was not approved to fill all backfills or additional head counts to handle the increased workload from merger/larger company;

eee. Scott Hayes (peer and eventually Plaintiff's replacement, White male, younger) received one additional HC during hiring freeze period. He would also be prematurely promoted to Group VP replacing Plaintiff, while Plaintiff continued to carry out the role for 6+ months and filling the seven HC that were finally approved upon her termination;

fff. Julie Paterman (peer, White female in UK, younger) who has the smallest client

group size and fewest employee population received multiple new additional HC

and was promoted to Group VP. With Julie Paterman's promotion to Group VP,

she also received two VP roles under her, Karen Kinzett-Evans and Kate

Brenneke, both younger. Karen Kinzett-Evans and Kate Brenneke each have 15

people under them while Plaintiff only had 4 FTEs and is still at a 3 FTE deficit at

such time (with only the Executive Director title) and a significantly larger

scope/remit;

ggg.  Plaintiff was terminated, which allowed for the promotion of Renu Jeyakumar

(younger Asian/Indian female) and Plaintiff would be replaced by a younger

employee, Scott Hayes;

hhh.  While Plaintiff fought for her title, Scott Hayes would be prematurely promoted

and allowed to enjoy the benefits of his title without doing any of the work, which

Plaintiff continued to do and had to fill seven HC all while managing during the

busiest time of the year for the Compensation/TR team.

150.  Defendant WBD's conduct, by and through its agents and employees, including without

limitation Ralph Beidelman at Defendant WBD, in treating the Plaintiff in a manner

unequal to other younger employees as described above, discriminatorily denied Plaintiff

equal treatment on the basis of age in violation of the New York State Human Rights

Law, N.Y. Exec. Law § 296.

151.  The discriminatory acts of Defendant WBD as described above were intentional and were

substantially motivated on the basis of Plaintiff's age.

152.  As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to

suffer damages and losses including, but not limited to, reputational harm, lost wages,

lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

### COUNT SEVEN: AGE DISCRIMINATION UNDER NEW YORK CITY HUMAN RIGHTS LAW § 8-107

153. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 152, as if fully set forth herein.

154. Defendant WBD has unlawfully and willfully discriminated against Plaintiff substantially because of her age as set forth above with regard to the terms, conditions and opportunities of her employment in violation of New York City Human Rights Law § 8-107.

155. Defendant WBD has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of New York City Human Rights Law § 8-107 as it took adverse actions as set forth above against the Plaintiff, who is 50 years old, who was qualified for her position and was performing in exemplary fashion at the time she was terminated.

156. Defendant WBD's termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

157. As a result of the Defendant WBD's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT EIGHT: SEX DISCRIMINATION IN VIOLATION OF TITLE VII

158.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 157, as if fully set forth herein.

159.    Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her sex, which is female.

160.    Plaintiff was repeatedly treated differently than her similarly situated male coworkers including but not limited to:

    iii.    Plaintiff is equally qualified if not more in comparison to Jacque Wright and Scott Hayes. Plaintiff not only carried a larger, more complex, scope and operated without a full team/fewer resources compared to Jacque Wright, but she was also paid substantially less than him;

    jjj.    Plaintiff is the only one among her peers to not be named a VP when the other males (Jacque Wright, Brian Mullins, and Scott Hayes) have enjoyed the title and the benefits that went along with it;

    kkk.    Scott Hayes (peer and eventually Plaintiff's replacement, White male, younger) received one additional HC during hiring freeze period. He would also be prematurely promoted to Group VP replacing Plaintiff, while Plaintiff continued to carry out the role for 6+ months and filling the seven HC that were finally approved upon her termination;

    lll.    Plaintiff was terminated would be replaced by a younger, male employee, Scott Hayes;

    mmm.    While Plaintiff fought for her title, Scott Hayes would be prematurely promoted

60

and allowed to enjoy the benefits of his title without doing any of the work, which Plaintiff continued to do and had to fill seven HC all while managing during the busiest time of the year for the Compensation/TR team.

161. Defendant WBD's conduct, by and through its agents and employees, including without limitation Ralph Beidelman, Jean Ermer, and Joe Song at Defendant WBD, in treating the Plaintiff in a manner unequal to other male employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq*.

162. The discriminatory acts of Defendant WBD as described above were intentional and were substantially motivated on the basis of Plaintiff's sex.

163.  As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT NINE: SEX DISCRIMINATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296**

164. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 163, as if fully set forth herein.

165. Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her sex, which is female.

166. Plaintiff was qualified for her position and was performing in exemplary fashion at the

61

time she was terminated.

167. Plaintiff was repeatedly treated differently than her similarly situated male coworkers including but not limited to:

nnn. Plaintiff is equally qualified if not more in comparison to Jacque Wright and Scott Hayes. Plaintiff not only carried a larger, more complex, scope and operated without a full team/fewer resources compared to Jacque Wright, but she was also paid substantially less than him;

ooo. Plaintiff is the only one among her peers to not be named a VP when the other males (Jacque Wright, Brian Mullins, and Scott Hayes) have enjoyed the title and the benefits that went along with it;

ppp. Scott Hayes (peer and eventually Plaintiff's replacement, White male, younger) received one additional HC during hiring freeze period. While Plaintiff fought for her title, he would also be prematurely promoted to Group VP and allowed to enjoy the benefits of his title without doing any of the work, which Plaintiff continued to do and had to fill seven HC all while managing during the busiest time of the year for the Compensation/TR team;

qqq. Plaintiff was terminated would be replaced by a younger, male employee, Scott Hayes.

168. Defendant WBD's conduct, by and through its agents and employees, including without limitation Ralph Beidelman, Jean Ermer, and Joe Song at Defendant WBD, in treating the Plaintiff in a manner unequal to other male employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of sex in violation of New York State Human Rights Law, N.Y. Exec. Law § 296.

169. The discriminatory acts of Defendant WBD as described above were intentional and were substantially motivated on the basis of Plaintiff's sex.

170. As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT TEN: SEX DISCRIMINATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107**

171. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 170, as if fully set forth herein.

172. Defendant WBD has unlawfully and willfully discriminated against Plaintiff substantially because of her sex as set forth above with regard to the terms, conditions and opportunities of her employment in violation of New York City Human Rights Law § 8-107.

173. Defendant WBD has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of New York City Human Rights Law § 8-107 as it took adverse actions as set forth above against the Plaintiff, who is female, who was qualified for her position and was performing in exemplary fashion at the time she was terminated.

174. Defendant WBD's termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

175. As a result of the Defendant WBD's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational

harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT ELEVEN: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

176.  Plaintiff repeats and realleges the allegations of Paragraphs 1 through 175, as if fully set forth herein.

177.  Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the ADA in that she has Generalized Anxiety Disorder with Depression and Insomnia, and she informed Defendant WBD of her conditions as she had to take FMLA leave as a result.

178.  Defendant WBD is covered by the ADA and is subject to its mandates.

179.  At all relevant times Plaintiff was qualified to perform the essential functions of her job as Executive Director, Compensation, with or without accommodations.

180.  Despite Plaintiff going on FMLA leave due to the untenable conditions of her employment, Defendant WBD forced Plaintiff to continue to work with a 3 FTE HC deficit upon her return. Further, Plaintiff's accommodations were not followed. Ultimately, Plaintiff would be terminated. Defendant WBD chose a reorganization plan that forced Plaintiff out as the sacrificial lamb in order for her team get the resources they desperately needed as Plaintiff was not given enough support despite her several pleas. Defendant WBD would replace Plaintiff with a younger, less qualified allegedly nondisabled male peer.

181.  Plaintiff suffered adverse employment action because of her disability or perceived disability including but not limited to being terminated without cause.

182.   Defendant WBD knew of Plaintiff's disability as Plaintiff disclosed her condition in order to go on FMLA leave.

183.   The adverse employment actions taken against Plaintiff as described herein above were substantially motivated by the discriminatory animus of Defendant WBD, by and through its employees, based on Plaintiff's actual and perceived disabilities.

184.   Defendant WBD cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against Plaintiff. Any excuse proffered by Defendant WBD is not legitimate and is merely a pretext for discrimination based on Plaintiff's actual or perceived disability.

185.   As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT TWELVE: DISABILITY DISCRIMINATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296**

186.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 185, as if fully set forth herein.

187.   Throughout her employment with Defendant WBD, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her disability.

188.   Plaintiff was qualified for her position and was performing in exemplary fashion at the time she was terminated.

189.   Despite Plaintiff going on FMLA leave due to the untenable conditions of her

65

employment, Defendant WBD forced Plaintiff to continue to work with a 3 FTE HC deficit upon her return. Further, Plaintiff's accommodations were not followed. Ultimately, Plaintiff would be terminated. Defendant WBD chose a reorganization plan that forced Plaintiff out as the sacrificial lamb in order for her team get the resources they desperately needed as Plaintiff was not given enough support despite her several pleas. Defendant WBD would replace Plaintiff with a younger, less qualified allegedly nondisabled male peer.

190. Plaintiff suffered adverse employment action because of her disability or perceived disability including but not limited to being terminated without cause.

191. Defendant WBD knew of Plaintiff's disability as Plaintiff disclosed her condition in order to go on FMLA leave.

192. The discriminatory acts of Defendant WBD as described above were intentional and were substantially motivated on the basis of Plaintiff's disability.

193.  As a result of Defendant WBD's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT THIRTEEN: DISABILITY DISCRIMINATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107**

194. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 193, as if fully set forth herein.

195. Defendant WBD has unlawfully and willfully discriminated against Plaintiff substantially because of her disability as set forth above with regard to the terms, conditions and

opportunities of her employment in violation of New York City Human Rights Law § 8-107.

196.     Defendant WBD has unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of New York City Human Rights Law § 8-107 as it took adverse actions as set forth above against the Plaintiff, who is female, who was qualified for her position and was performing in exemplary fashion at the time she was terminated.

197.     Defendant WBD's termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

198.     As a result of the Defendant WBD's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT FOURTEEN: VIOLATION OF THE EQUAL PAY ACT

199.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 198, as if fully set forth herein.

200.     Plaintiff asserts a claim for discrimination based on sex with regarding compensation for comparable work pursuant to the Equal Pay Act of 1963, 29 U.S.C. § 206(d).

201.     Defendant WBD paid different wages to a male employee for comparable work. In fact, Plaintiff had a larger remit with less resources in comparison to her male peer, Jacque Wright. Plaintiff sought redress regarding this unequal treatment and was penalized as she was still making less than her male peer without any retro/backdating that made

Plaintiff ineligible for the 4% merit in March of 2022. She continued to make less than him. To add further insult, she will also receive a much lower severance than him.

202. Jacque Wright received a significant off-cycle adjustment without explanation. There was also ZERO increase in scope to Jacque Wright's role, yet he was given a $35,000 increase while ALSO keeping him eligible for the upcoming 4% merit cycle by making the adjustment retroactive to August 1, 2021. As a result, he saw an increase from $267,800 to $300,000 retroactive to August 1, 2021, for merit eligibility resulting in a $312,000 base salary at March 1, 2022.

203. Defendant WBD deprived Plaintiff of wages she earned.

204. Defendant WBD paid different wages to employees of the opposite sex as set forth herein, although the comparable male and female employees performed equal work on jobs requiring equal skill, effort, and responsibility and the jobs in question were performed under similar working conditions.

205. Defendant WBD should be held liable on this count and Plaintiff should be awarded all full and appropriate relief.

## COUNT FIFTEEN: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

206. Plaintiff repeats the allegations of Paragraphs 1 through 205, as if fully set forth herein.

207. The Plaintiff's employment with Defendant WBD was based on an employment agreement. The terms and conditions of Plaintiff's employment were set forth in the aforementioned Agreement and in various benefit plan documents.

208. Defendant WBD had a duty to use good faith and fair dealing to fulfill its contractual obligations with Plaintiff.

209. Plaintiff justifiably relied on Defendant WBD not to engage in bad faith actions to deprive her of the benefits of her employment agreement including her ability to earn her salary, to work in a work environment free of discrimination, and be considered for promotions for which she was well-qualified.

210. Further Plaintiff justifiably relied on Defendant WBD to act in good faith in managing the Company without attempting to force Plaintiff out for discriminatory reasons in an effort to elevate a less qualified, younger, male peer, Scott Hayes.

211. Defendant WBD engaged in bad faith actions to deny the Plaintiff the benefits of the agreement in that it injured Plaintiff's right to receive the fruits of the contract. Plaintiff's mistreatment was so dire that she had to take FMLA leave at the behest of her medical provider only to return to the same hostile work environment. Then, Defendant WBD would chose to undergo a restructuring that lead to Plaintiff's termination and replacement by a less qualified, younger, allegedly nondisabled, male peer, Scott Hayes.

212. As a result of Defendant WBD's breach of the duty of good faith and fair dealing it owes to Plaintiff, Plaintiff has been, and continues to suffer damages and losses in the form of lost wages, lost benefits, and compensation in an amount to be determined at trial.

**COUNT SIXTEEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

213. Plaintiff repeats the allegations of Paragraphs 1 through 212, as if fully set forth herein.

214. The actions of Defendant WBD as set forth above, including the acts of discrimination including without limitation to unilaterally increasing the remit of the Plaintiff's position, failing to provide her adequate resources and headcount while others were provided such, paying Plaintiff less than her male, Black peer, refusing to give her the title she earned while a male peer enjoys a premature promotion without doing the work (Plaintiff was

69

doing that work), and being terminated and replaced by a less qualified, younger, allegedly nondisabled, male peer, Scott Hayes.

215. In taking the actions against Plaintiff as aforesaid, Defendant WBD intended to inflict emotional distress or it knew or should have known that emotional distress was the likely result of its conduct.

216. The conduct of Defendant WBD in this case was extreme and outrageous and was the cause of Plaintiff's distress.

217. The emotional distress sustained by Plaintiff was severe.

218. As a direct result of Defendant WBD's intentional actions, Plaintiff suffered emotional distress, stress, vomiting and feeling unwell that prompted treatment, extreme hair loss, extreme weight loss, and insomnia, all to her loss and damage.


**COUNT SEVENTEEN: ERISA 502(a)(b) and (a)(3) SEVERANCE CLAIMS**

219. Plaintiff repeats the allegations of Paragraphs 1 through 218, as if fully set forth herein.

220. Plaintiff asserts an unlawful denial of ERISA severance benefits pursuant to Section 502(a)(1)(b) and (a)(3).

221. The operative plan is the Warner Media, LLC U.S. Severance Plan (the "Plan"), established and effective as of August 1, 2022 by Warner Media, LLC (the "Company" and "Plan Sponsor").

222. On March 12, 2024, the Plan Sponsor and Plan Administrator of the Warner Media, LLC U.S. Severance Plan, sent a letter [Shane Johnson letter] to Plaintiff denying her claim for severance benefits pursuant to ERISA Sections 502(a)(1)(b) and (a)(3).

223.    For the reasons stated herein, the Plan Administrator failed to conduct a full and fair review pursuant to ERISA, 29 C.F.R. § 2560.503-1 and the final decision was an abuse of discretion considering two conflicts of interest.

224.    The claim denial on appeal must be respectfully reversed because there is an abuse of discretion as to the implementation of the proper level of severance benefits to Plaintiff as the plan participant. The plan provides for discretion to interpret the plan, thus the standard of review by a federal court is arbitrary and capricious. The Plan Administrator and Plaintiff offer competing interpretations of the plan language (below). There exists two structural conflicts of interest on behalf of the Plan Sponsor/Plan Administrator. First, the Plan is self-funded by the Plan Sponsor. Second, the Plan Administrator offers a self-serving interpretation of ambiguous plan language regarding the amount of severance Plaintiff is entitled to. In such circumstances, the conflicts of interest prevail in a tie breaker situation such as this case. *See Metlife v. Glenn*, 554 U.S. 105, 115 (2008).

225.    The Plan is self-funded: "[a]ll payments made during any notice period and severance payments made under the Plan are paid out of the general assets of the Company."

226.    The disputed plan language is as follows:

If you are eligible for severance pay under the terms of this Plan, as determined by your Participating Employer, you will receive severance pay in an amount equal to two weeks of your salary ("Base Severance"), PLUS an amount computed pursuant to Section A. or B. below, as the case may be…

**B. Job Elimination and Other Involuntary Not for Cause Termination; Executive Termination**

For a Job Elimination or Other Not for Cause Involuntary Termination or an Executive Termination, an additional two weeks of your salary for each year of Continuous Service (as defined below) that you have completed on the date of your termination of employment; provided, however, if you have completed at least ten (10) years of Continuous Service on your Employment End Date, you will receive an additional three

71

weeks salary for each year of Continuous Service, provided that there is a minimum level of severance pay for Job Elimination, or Other Involuntary Not for Cause Terminations and Executive Termination as follows:

| Level or Equivalent | Minimum Severance Pay |
|---|---|
| Vice President or above | 26 weeks |
| Director | 12 weeks |
| Other Employees | 2 weeks |

227.   The above plan language is ambiguous because of the use of the following language "…provided that there is a minimum level of severance pay for Job Elimination,…", which is inserted to qualify the preceding plan language immediately before it, "…provided, however, if you have completed at least ten (10) years of Continuous Service on your Employment End Date, you will receive an additional three weeks salary for each year of Continuous Service…"  When Plaintiff read the above language, she reasonably interpreted that she would receive the minimum 26 weeks of severance given her position PLUS ten (10) additional weeks of severance pay for her four years of service with the company.  Under the *contra preferentem* doctrine, any ambiguity in the above plan language must be viewed against the Plan and the Plan Administrator's interpretation of the plan language.

228.   When an administrator both evaluates and pays benefits claims, a conflict of interest exists that may be weighed as a factor in determining whether there is an abuse of discretion. Any conflict of interest does not change the standard of review from deferential to *de novo;* it merely requires the reviewing judge to take account of the conflict when determining whether the insurer abused its discretion. Conflicts of interest should prove more important when there are circumstances to suggest a higher likelihood

72

that the conflict affected the benefits decision. Evidence that a conflict affected a decision may be categorical such as a history of biased claims administration or case specific such as an administrator's deceptive or unreasonable conduct.

229.   Plaintiff asserts the plan language specifies she is entitled to 36 weeks of severance pay by reasonably adding 10 weeks of severance to the minimum level of severance for her position of Vice President.  The Plan Administrator/Plan Sponsor stated in a self-serving manner that Plaintiff is initially entitled to 10 weeks and then subject to the greater of a minimum of 26 weeks. No where in the Plan language does it prohibit adding the base severance plus two weeks per year of service to the minimum severance amount. When the Plan provided for a schedule of anticipated severance benefits, all participants reasonably could interpret the language as providing a base minimum severance under the Plan for which they added two weeks of salary plus an additional two weeks for each year of service.

230.   On February 29, 2024, Plaintiff submitted her claim for severance benefits for 36 weeks of severance. On March 6, 2024, the severance claim was acknowledged by her former boss Ralph Beidelman "Administrator, Warner Media, LLC U.S. Severance Plan."  On December 4, 2023, Plaintiff filed a claim of employment discrimination against her employer and identified Ralph Beidelman, her supervisor, as the individual charged with racial, age and gender discrimination.  The claim of employment discrimination was specifically included in the appeal record to the Plan Administrator.  On April 24, 2024, Plaintiff filed her federal court complaint against her employer, the Plan Sponsor, alleging employment discrimination and specifically named her supervisor Ralph

73

Beidelman as the perpetrator of the discrimination ("administrator's deceptive and unreasonable conduct").

231.   Due to the two articulated conflicts of interest, the Plan Sponsor in acting as the Plan Administrator abused its discretion and should have provided 36 weeks of pay. The abuse of discretion is further heightened by the underlying employment discrimination claims which exhibited a bias on behalf of the Plan Sponsor/Employer/Plan Administrator Mr. Beidelman when determining the calculation of her severance benefits under the Plan.

232.   On information and belief, the Plan Administrator for the Plan awarded severance benefits to two other employees Alex MacCollum and Ben Hill, both of whom were paid a significant amount of severance benefits under the Plan contrary to the terms of the Plan. Specifically, each aforementioned employee was awarded severance payments far more that permissible under the same plan language that was used to determine Plaintiff's claim for severance benefits and the denial of the same claim for thirty-six (36) weeks of severance pay upon termination. Both MacCollum and Hill were treated favorably because they were receiving severance when they should not have been per plan/contract. MacCollum's employment contract stated any/all severance payment would stop, or require repayment, upon new employment. On information and belief, Defendants discovered Alex MacCollum was working at the Washington Post and still collecting severance of $50,000 per month for six (6) months. The Defendant's Plan Administrator and Chief People Officer granted an exception that MacCollum would not have to repay the severance she continued to receive from Defendants and allowed her to continue receiving the severance for five (5) more months while she remained working at the Washington Post which was against her contract/employment agreement and the

severance plan she was eligible for at the time in April 2022.  On information and belief, Ben Hill resigned voluntarily and immediately began working for a peer company, yet, was receiving $40,000 per month severance for the next 1-2 years. He was not terminated for cause or involuntarily terminated nor was his role eliminated. Like Plaintiff, MacCollum and Hill were plan participants under the Defendants severance plan, yet they were treated more favorably than what the plan language provides.  These facts demonstrate the arbitrary and capricious action to deny Plaintiff severance benefits under the plan.

233. For the foregoing reasons, Plaintiff respectfully requests that the Plan reverse its decision denying her Severance Pay benefits in accordance with the Summary Plan description.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a)   Award compensatory damages;

(b)   Award punitive damages;

(c)   Award attorneys' fees and costs;

(d)   Award severance benefits and equitable relief;

(e)   Award pre-judgement interest;

(f)   Award post-judgement interest; and

(g)   Award such other relief in law or equity as this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all questions of fact raised by her Complaint.

Respectfully submitted,

PLAINTIFF
ELLE LALLI

By: ___/s/_____
    Mark P. Carey (MC6798)
    Carey & Associates, P.C.
    71 Old Post Road, Suite 1
    Southport, CT 06890
    (203) 255-4150 tel.
    (203) 255-0380 fax
    mcarey@capclaw.com
    *Her Attorneys*

# **EXHIBIT A**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Atlanta District Office**

100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
Intake Information Group: 800-669-4000
Intake Information Group TTY: 800-669-6820
Atlanta Direct Dial: (470) 531-4760
FAX (404) 562-6909/6910
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

**To:** Elle Lalli
425 Montgomery Ferry Drive
Atlanta, GA 30309
Charge No: 410-2024-02385

EEOC Representative and email:    Norberta Pendleton
Investigator
norberta.pendleton@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 410-2024-02385.

On behalf of the Commission

I. Daniel-Edward Anance
Digitally signed by I. Daniel-Edward Anance
Date: 2024.02.06 15:05:05 -05'00'

*Ariketekana D-C Anance*        *For*

Darrell E. Graham
District Director

**Cc:**
Leslie Dent
Littler Mendelson, P.C.
3424 Peachtree Road, NE, Suite 1200
Atlanta, GA 30326

Mark Carey
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT 06890

Please retain this notice for your records.