# EXHIBIT
# B

| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form | AGENCY<br>[XX] FEP<br>[XX] EEOC | CHARGE # |
|---|---|---|

EEOC, New York State Human Rights Commission, City of Atlanta Human Relations Commission
State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.)<br>Elle Lalli | HOME TELEPHONE NO. (include area code)<br>203-255-4150 |
|---|---|

| STREET ADDRESS     CITY, STATE AND ZIP CODE<br>425 Montgomery Ferry Drive, Atlanta, GA 30309 | DATE OF BIRTH<br>4/27/73 |
|---|---|

NAME IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME

| NAME<br>Warner Brothers Discovery | NUMBER OF EMPLOYEES<br>500+ | TELEPHONE NO. (include area code)<br>(212) 548-5555 |
|---|---|---|

| STREET ADDRESS     CITY, STATE AND ZIP CODE<br>230 Park Avenue South, New York, NY 10003 | COUNTY<br>New York |
|---|---|

| NAME:     TELEPHONE NO. (include area code) | |
|---|---|
| STREET ADDRESS     CITY, STATE AND ZIP CODE | COUNTY |

CAUSE OF DISCRIMINATION BASED ON (check appropriate box(es))

[X]RACE    [ ]COLOR  [X]SEX  []RELIGION  [ ]NATIONAL ORIGIN
[X] SEX    [ ]RETALIATION  [X]DISABILITY  [X]AGE

[ ] OTHER

DATE OF DISCRIMINATION
TOOK PLACE
EARLIEST    LATEST
4/2020    Present

CONTINUING ACTION [X]

THE PARTICULARS ARE:

    **SEE ATTACHED CHARGE AFFIDAVIT OF ELLE LALLI.**

I declare under penalty of perjury that the foregoing is true and correct.

Date 12·1·23

Charging Party (Signature)

Signature of Complainant

SUBSCRIBED AND SWORN TO BEFORE ME THIS DAY
(day, month, year) 1·12 MMA 2023

Notary/Commissioner of the Superior Court

**UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**CITY OF ATLANTA HUMAN RELATIONS COMMISSION GEORGIA COMMISSION**
**ON EQUAL OPPORTUNITY**
**NEW YORK STATE DIVISION OF HUMAN RIGHTS**

| | | |
|---|---|---|
| **ELLE LALLI,** | : | |
| Complainant | : | |
| | : | **EEOC No.** |
| v. | : | **AHRC No.** |
| | : | |
| | : | |
| **WARNER BROTHERS** | : | |
| **DISCOVERY,** | : | **November 13, 2023** |
| Respondent | : | |
| | : | |

### CHARGE AFFIDAVIT OF ELLE LALLI

**ELLE LALLI,** being duly sworn and of sound mind, do hereby affirm the following:

1.  I am over the age of twenty-one and understand the meaning of an oath. The following information is based on my personal knowledge and set forth herein under penalty of perjury.

2.  I currently reside in Atlanta, Georgia, and work for the Respondent at 1050 Techwood Drive NW, Atlanta, GA 30318 and remotely with the New York City office at the company headquarters located at 230 Park Avenue South, New York, NY 10003.

3.  I am 50 years old and my date of birth is April 27, 1973.

4.  On April 15, 2020, I began working at WarnerMedia Services, LLC ("WarnerMedia" or "WM") as a consulting compensation leader. I was given a title in the system as "Compensation Partner Leader," which is different than my direct peers who had "VP, Compensation" or "Executive Director, Compensation" titles when I joined the company. My manager was Jean Ermer, SVP Global Total Rewards. I started the position with a base salary of $265,000 and 25% annual bonus target.

1

5.      Later in April 2022, WarnerMedia would merge with Discovery and become Warner

Brothers Discovery ("WBD" or the "Respondent").

6.      Respondent is a global media and entertainment company and its headquarters is 230

Park Avenue South, New York, NY 10003.

7.      Prior to me joining, the remit/scope of the role was increased without my consent;

therefore, the new role became a much larger role than the role I accepted.  WarnerMedia

had about 30,000 employees in total globally (the majority of employees are/were based

in the United States and Canada ("US/CAN"), with approximately 5,000 employees in

other countries).  The company had 6 Business Units ("BUs").

8.      Prior to joining WarnerMedia ("WM"), I worked for Cisco Systems, Inc. ("Cisco"),

which has $51+ billion in revenue and over 80,000 employees globally.  At Cisco, I held

multiple leadership roles, including a key strategic partner in designing and standing up a

first-time-through global internal start-up/incubator environment replicating a start-up

compensation offering and use of performance restricted stock units.  This critical effort

allowed Cisco to fast-track innovation, disrupt the market via a pivot towards SaaS

(Software as a Service) offerings and attract/retain top-notch talent from top big tech

competition.  Overall annual investment was over $500 million in equity alone and high-

visibility with ELT (Executive Leadership Team) and Board of Directors/Compensation

Committee.  In addition, I led the compensation consulting effort for the Engineering line

of business globally (approximately 35,000 employees), requiring people leadership for

six direct reports in multiple locations, close partnership and direction provided to

regional compensation partners, while directing sub-teams within the Global

Compensation Center of Expertise ("CoE"), such as market pricing and planning and

analytics resources to support design and consulting offerings, and cross-team partnership with HRBP (HR Business Partner), Finance, Legal, and Equity teams. The pace at Cisco was very fast (as was the case at many of my previous companies, such as Bain & Company, Accenture, and Home Depot). My roles were often new and typically required leading high profile, transformational, end-to-end delivery. I have a consistent track record of success and measurable impact enabled by the level of support and advocacy from my manager/leaders and partners.

9.    Within 1-2 weeks leading up to my start date at WM, I was informed by Jean Ermer that they had suddenly changed the scope of my new role due to the unexpected departure of a compensation team lead. They added one of the largest, and I was told, more challenging BUs, News/CNN & Sports (Turner Sports). Jacque Wright could have taken on this BU, but it was thrust upon me instead. I had already resigned from Cisco and was put in an extremely financially challenging situation, such that I felt I could not decline the role despite a bait and switch to my role scope.

10.   As a result, my scope/remit would be substantially larger than the scope/remit of the other WarnerMedia Global TR/Compensation team consulting leaders (Jacque Wright and Becky Eshalomi).

    a.   When I accepted the Compensation leader role, the scope was for 3 BUs and about 10,000 employees in total. The BUs consisted of 1) the WM Technology Office; 2) Revenue & Distribution; and 3) Corporate Functions, which included Finance, Legal, and Human Resources. My total team size was to be: 4 full time employees ("FTEs"), 2 filled and 2 open for me to hire; therefore, only half of the team was staffed.

b.   Upon me joining, my remit <u>increased</u> to 4 BUs (adding News/CNN & Sports) resulting in about 15,000 total employees – my scope increased substantially carrying <u>half</u> of WarnerMedia total employee population. News/CNN & Sports were known to be challenging because the of 24/7 nature of news and live sports/especially during Covid. I was told they also had a reputation of being a demanding client group.

c.   The entire global organization was shared with two other consulting peers, Jacque Wright (Black male) and Becky Eshalomi (Black female). Jacque Wright and I shared the US/CAN populations, which is where the bulk of the employee population sat. Becky Eshalomi led the international population of about 5,000 employees. With the last-minute increase in my scope, I now carried 4 of the 6 BUs, and approximately 15,000 employees in total. Jacque's remit was 2 BUs and approximately 10,000 employees. My total team size became 7 FTEs, only 3 filled and 4 open roles to be filled, resulting in less than a half-staffed team to carry out my now larger role. My peer, Jacque Wright, had 9 total FTEs, with 7 filled (mostly senior roles) and 2 open roles for entry Analysts. I was set up to fail since joining.

11.   In addition to my day-to-day compensation consulting responsibilities, I was expected to accelerate a first time through, business critical Global Job Architecture/Career Framework for critical technical talent population for the direct-to-consumer ("DTC") products, such as HBOMAX and CNN-Digital. The framework required a market competitive career path via job architecture and a new, differentiated compensation design (including an aggressive offering of equity/RSUs, which was not common practice

4

at WM), final approval from Executive Leadership Team, ("ELT") and implementation/go-to-market for the new career framework by January 1, 2021 (a very aggressive 8 month timeline as a new employee while also needing to fill more than half of the roles on my team (4 open roles). This high-profile, high-impact program enabled the business and talent strategy to attract and retain critical technical talent needed to support the various launches for HBOMAX and eventually CNN+. The external talent competition focused on Netflix, Amazon, Meta, Google, Microsoft, Apple and Disney/Hulu.

12. When the fourth BU was initially added to my remit, I told Jean that I needed to reconsider my decision and needed time to discuss it with my husband. After not hearing from me for a few days, Jean countered with $20,000 more in base salary, bringing my base salary to $265,000 (my original offer was $245,000). I still paused. Ultimately, I was in a conundrum since I had already given notice at Cisco, as I mentioned above. When I had joined Jacque (my peer) only had 2 BUs and he made a very similar base salary to my offer when I was handling 4 BUs. Even then, if my remit remained at 3 BUs, I would have made $245,000 to Jacque's about $262,800 for 2 BUs. Thus, I would have made $17,800 less for a larger remit!

13. Upon information and belief, Jacque made $262,800, but when Jean countered my original offer with $265,000 shortly after I started, Jacque received an ad hoc market adjustment of $5,000 resulting in his salary at $267,800. Therefore, he always made more than me for lesser scope/remit in comparison to me.

14. I was the ONLY external hire of Jean Ermer's (SVP of Global Total Rewards) team. Jean worked for Warner Brothers ("WB") for many years. All other peer roles were

5

former WB direct reports of Jean with 10+ years of experience working together. Since day one, the environment was a me versus WB favoritism game. There was a lack of diverse market experience (outside of the WB way) and I experienced feelings of exclusion and lack of support. My direct reports also shared the same sentiments, feeling their ideas or suggestions were not being heard by others/leadership, and would raise concerns to me, which I would bring to Jean Ermer, but were met with no action to address. Of the three roles filled on my team when I joined, each were former HBO or Turner. They expressed frustration about not being fairly considered for certain roles and the lack of resources they received while witnessing other teams adequately staffed – the majority of whom were legacy WB teams.

15.     In late summer and early fall of 2020, the new WM CEO, Jason Kilar, announced an Operating Model change, which finally forced Jean Ermer to shift the BU client groups between Jacque Wright and me. As of January 1, 2021, I had 3 BUs instead of 4, but I had to share two team members (Angela Spivak and Julia Clowe) with Jacque for almost one year. As of note, when I had 4 BUs, Jacque did not share any of his team members with me. I continued to have fewer headcount, still only seven total. Jacque had seven filled roles with one of the two open Analyst roles elevated to a Compensation Partner role (mid-level role versus entry level) to help support the two BUs he took on from me, which were Corporate Functions and Ad Sales & Distribution. Jacque had four team members (which included the now elevated Analyst open role) to support these two BUs, while I was expected to support them with only two FTEs.

## ADVERSE ACTION

16. From Summer 2020 to the end of 2022, I was harassed by a senior HR Leader, Sharon White (Black female), SVP of HR for WarnerMedia Technology Office ("WMTO"), for simply bringing my external, tech diverse experience to the table to help drive the transformational change WM was seeking (this type of expertise is the exact reason I was sought after/approached by WM). The first blatant incident occurred in early October 2020. Sharon White approached my direct report, Mi Chang, speaking disparagingly about me without any reason or context. Sharon shared that she refused to work with me, instructing Mi Chang to be sure there were no meetings scheduled with her and me together. Sharon White was one of the main stakeholders for the DTC Tech Talent Career Framework strategic effort; we had to be in meetings together. Mi Chang was put in an extremely awkward position by this senior leader. Mi Chang was compelled to make me aware of what Sharon said, which I very much appreciated.

## PROTECTED ACTIVITY

17. When I raised the incident with Sharon to Jean Ermer and Joe Song, I was met without support. I was left to fend, or advocate for myself, meanwhile they allowed the bullying by Sharon to continue, and actually enabled it. Per Sharon's request, Jean Ermer attended my weekly implementation meetings on the DTC Tech Talent Career Framework go-to-market effort. I assume Sharon did this to intimidate me and essentially requested to have my manager present during meetings I was leading to "watch over me." I asked Jean whether Sharon provided a reason for this request; Jean could not explain why the request was made. Jean never once added any useful or effective input during the meetings she attended or provide any feedback to me that

7

would have suggested I conducted the meetings inappropriately. Nor did Jean defend me in any way to Sharon to say that I was completely capable of driving this critical effort, and there is no need for her to spend her time babysitting me. I was brought to WM to lead exactly this type of high profile, fast-paced initiative, I was doing my job, and very successfully given my skillset and expertise despite the obstacles.

## PROTECTED ACTIVITY

18.     I had done nothing to cause Sharon to attack me. Despite my concerns raised to WM Total Rewards leadership and nervousness/unsafe feelings to interact with Sharon, I had to have my own conversation with her. I specifically asked Jean Ermer and Joe Song, SVP TR, Talent Management, Talent Acquisition (Jean's manager), to please address Sharon with me as I was not comfortable speaking to her alone. Instead, I received a very curt email from Sharon stating that, "Joe said we need to talk." During this conversation, Sharon told me, "to never forget that WM is first and foremost a media, entertainment company, and not a tech company." Her approach was extremely unprofessional and certainly not expected from a SVP, HR of Technology Office for WM, who ideally is looking to help support the organization's talent strategy to attract and retain critical tech talent needed to successfully launch WM's DTC products.

19.     From August 2020 to January 2021 (during the roll-out of the approved DTC Tech Talent Career Framework), I would experience vomiting like clockwork on Fridays at the end of workday every few weeks and it lasted most of the weekend. I would also feel extremely lightheaded and dizzy. The extremely long hours due to insufficient resources to carry out my remit, lack of eating/drinking well, and constant state of distress caused by the work environment began to physically manifest. When I was sick for the weekend, I

would fall behind on home/family responsibilities. The pressure mounted at home because of the lack of support/inadequate resources and hostile/unsafe environment at work.

20. WM/WBD perpetuates a toxic, hostile work environment as they favor certain individuals versus properly supporting or recognizing those employees who are best qualified for roles and driving change. From the top down, there is not much trust due to the constant flip flopping of leadership decision making. There is a perception that appointment or selection for roles are not fairly considering the most qualified talent. This breeds mistrust and lack of support or advocacy. There is blatant favoritism especially as discussed above. My direct peer, Jacque, was a direct beneficiary of this unfair policy. Then, Scott Julie, and Renu most recently (all my peers).

21. I have physicals every year and normally take very good care of myself. I am never/rarely ever sick. Further, I have only gone to the doctor for well-visits, until I joined WM/WBD. By the fourth month of vomiting and feeling unwell while working at WM, I finally went to my PCP, who referred me to a gastroenterologist and cardiologist. Each specialist ordered multiple tests (endoscopy and colonoscopy, EKG, and ECHO). The tests revealed that the vomiting and lightheadedness was not caused from a condition, but likely a result of extreme stress from work manifesting in physical illness. My PCP prescribed a low dose anti-anxiety medication and anti-nausea medication to manage the stress and vomiting/nausea. I do not like taking prescribed medicines as it is not ideal for the body to have to process regularly, and was not thrilled to need to medicate, even at a low dosage in order to do my job. I only took the medication for 4-6

months to avoid the symptoms as I had no other choice in order to function in the hostile environment.

22. In addition, in 2021-2022 timeframe, I went to a dermatologist regarding my concerning hair loss. The PA confirmed I did not have a hair loss condition, but I needed to reduce stress. My hair loss was so bad that I even bought a "Halo," which is hair piece I can add via a head band like extension to hide the hair loss. This only added more stress given the impact on my appearance.

23. Prior to working for WM/WBD, I had never experienced the above symptoms due to my work environment. I believe the extreme stress caused by the hostile work environment at WM/WBD lead to my illness, weight loss, and hair loss.

## ADVERSE ACTION & PROTECTED ACTIVITY

24. In late November 2021, I learned of a significant pay adjustment made to Jacque Wright, VP Compensation (my peer, Black male). I raised concerns to HR/Nicole Vaughn and Jean Ermer via email and phone, but I was met with minimal concern or urgency to address it or an explanation for why a significant adjustment was made given no change in role or promotion occurred. I had to follow up with each of them multiple times.

25. As stated above, when I started at WM in April 2020, Jacque made $262,800. Shortly thereafter, he received a pay adjustment of $5,000. Thus, Jacque made slightly more than me at $267,800 base salary while I was brought in at $265,000 base salary with a much larger remit. In the fall of 2021, I learned of a significant pay adjustment to Jacque's compensation (this was an off-cycle adjustment, as our normal annual base salary increase occurs on approximately March 1 of each year). There was ZERO increase in scope to Jacque's role, yet he was given a $35,000 increase while ALSO keeping him

eligible for the upcoming 4% merit cycle by making the adjustment retroactive to August

1, 2021. As a result, he saw an increase from $267,800 to $300,000 retroactive to August

1, 2021 for merit eligibility, resulting in a $312,000 base salary at March 1, 2022 for a

**total increase of $45,000** – at this time there were no performance/ratings in practice. In

the meantime, I continued to be staffed with fewer resources than Jacque to do my job,

which was still a larger, very complex portion of the company following the client shift

on January 1, 2021 and included the fast-paced, highly technical DTC/Streaming –

HBOMAX and CNN+ product focus.

## PROTECTED ACTIVITY

26. The unfair treatment by WM had become so overwhelming, such that I went directly to

HR, Nicole Vaughn (Black female), in confidence, who was not able to explain why

Jacque received the significant pay increase when I had a larger, more complex portion of

the company but received no pay increase. Throughout my entire career, I have never

needed to go to HR for protection or concern of unfair treatment. Nicole sent me to my

manager, Jean Ermer, despite the fact that I wanted our conversation to be confidential

out of fear of retaliation. After much follow-up with both Nicole and Jean, Jean claimed

it was a "market adjustment for Geographic Differential." However, when I confirmed

that we do not apply a Geographic Differential for VP+ as a policy or practice at WM,

she explained that, "we are considering implementing one." This was not a practice in

place for WM nor is it a best practice in the market. If this was policy, both Jacque and I

should have had a more significant difference in pay for the first 18 months I was with

WM. I asked why this was occurring now all of a sudden, and why was I not made aware

of this change in policy given I am a compensation consultant to the business, and I

11

would have to inform/consult on this type of policy/practice change for all other VPs across my client groups. However, I received no other explanation.

## ADVERSE ACTION

27. Only after my continued questioning, Jean Ermer finally adjusted my pay by $15,000 effective November 28, 2021. However, she did so without any retro/backdating to earlier than October 1, 2021 as Jacque received, which made me ineligible for the 4% merit in March of 2022. Thus, I was begrudgingly given less than half the adjustment Jacque received, AND I was made ineligible for the March 2022 merit program while Jacque's adjustment was back dated to August 2021 to ensure he was also eligible for the annual increase in March 2022. This was discriminatory as I still carried a larger, arguably more complex, scope and operated without a full team/fewer resources than Jacque to do a similar role. Now, I am ALSO paid substantially less than my Black, male counterpart.

28. Up until I became aware of the significant gender/race pay inequity, my title in all systems was "Compensation Consulting Lead," which is a meaningless title (nor did it exist!) within WM. Thus, I was made to feel minimized by not having a title that carried an equal "value" as my peers. I raised this issue to Jean Ermer multiple times over the next 18 months, but I was made to feel silly for being concerned about it and I was told that it would be fixed soon. It wasn't.

29. Title is overly focused on at WM (and WBD) and it is definitely a status symbol and used to show importance/credibility. Jacque's title was/is "VP, Compensation" while I was shown as only a "Compensation Consulting Lead." My female, Black peer, Becky Eshalomi, based in the UK, had the title "Executive Director, Compensation." Titles

12

drove eligibility for trainings, policies, communications, etc. at the time (this will/has changed on October 16, 2023). In addition to title, Management Level is a field/employee data element in our HRIS (human resources information system) that drives eligibility, for policies, such as severance.

30. During the time that I raised the pay inequity and the title/Management Level concerns, the planned merger of WM and Discovery had already been announced and all employees were expecting a series of headcount reductions/cost synergies to occur in the coming months. Therefore, Management Level needed to be accurate in the system or I would be treated less than my peers if my job was impacted/eliminated at that time. Jacque Wright and Becky Eshalomi's Management Level reflected "Vice President" in HRIS/Workday, while my Management Level only reflected as "Director." While I was advocating for a pay adjustment to be treated equally to Jacque, I asked for my title and Management Level to be changed to reflect the same as my peers as well. My Management Level was made to Vice President, but my title was only changed to Executive Director, Compensation, not Vice President as Jacque's title indicated, again my direct peer.

31. A related observation, WM and now WBD, have been working on a Global Job Architecture initiative for several years. This requires leveling of all jobs from each of the companies based on similar scope, impact, complexity. In the new Job Architecture, that recently launched on October 16, 2023, my peers and I will be a Career Band/level 5-Vice President. Shortly after my title was changed to Executive Director (in late fall 2021), I realized that all the women at the time only had the Executive Director title, while the only two males (Jacque Wright and Brian Mullin) had the Vice President titles.

13

## ADVERSE ACTION

32.     On January 28, 2022, I was unfairly accused/blamed by Sharon White, SVP of HR for

WMTO, for something that was apparently inappropriately shared by an iStream Planet

("ISP") HR Business Partner, Chad Bauer, who sat on her team. This occurred in a

meeting that I was not aware of nor invited to. ISP was an acquisition that was left as a

standalone entity initially. The information shared supposedly sent the ISP leader, Jim

Newkirk, into a tirade in the presence of other WMTO leaders, per Sharon White's

recount of the situation. The meeting was held to discuss options for the approach to

integrate ISP employees onto the DTC Tech Talent Career Framework. Chad shared an

option that he thought Sharon preferred, but Jim would have been opposed to. Chad told

Sharon that I told him the option shared was her preference. I had no such conversation

with Chad.

33.     This ISP incident set off another series of panic attacks and extreme anxiety for me. A

recent metabolism test showed chronic stress conditions resulting in concerningly high

cortisol levels, so I needed to see endocrinologist. How could I even find time? I

researched and purchased cortisol management supplements as a way to help manage my

levels.

## PROTECTED ACTIVITY

34.     Within the first week of February 2022, I raised the incident to HR/Nicole Vaughn and

Jean Ermer/Joe Song, but no action was taken as of March 6, 2022. I reported the

incident almost immediately. I also spoke with Nicole Vaughn/HR. Her advice was to

try to "wait things out" given the fast-approaching expected merger close on April 7,

2022, and perhaps Sharon or I would be impacted/job eliminated, removing both or one

of us from the company (in other words, solving my concern without her having to actually do anything). She essentially dismissed my concerns. On March 8, 2022, I received an email from Jean addressing my resource concerns as I was starting to lose my team members out of concern for the outcome of the merger. Jean also responded to my concerns about Sharon. Rather than have my back and have a discussion with Sharon and me to address the behavior (as I requested), I was once again told to address it directly with Sharon on my own.

### ADVERSE ACTION

35. On March 3, 2022, I was yelled at by my boss, Jean Ermer. She yelled, "Don't ask me a question I can't answer!" I was taken aback. The question was, whether we should have any concern that the DTC Tech Latin America and EMEA (Europe, Middle East, Africa) 2021 salary ranges had been adjusted by the merit % for 2022 and shared with Talent Acquisition/HR by my peer, International Compensation Consulting teammates, meanwhile the US/CAN salary ranges have yet to begin the adjustment process, raising concerns of disjointed approaches across-geographies, which has consistently been raised as a point of frustration by global DTC BU SVP of HR, Michele Golden. My question was valid to ask of my manager and purely intended to be a discussion to agree on an approach, not an unprofessional yelling incident of manager to subordinate.

36. During the six months surrounding the April 7, 2022 WBD merger close from January 1, 2022, through June 2022, I lost 5 FTE HC and 1 Project Hire leaving me with only 2 FTE team members.

a. Mi Chang (direct report leading the WM Technology Office, Compensation
   Partner Lead), who departed at the end of January 2022 due to frustration caused
   from lack of sufficient resources (resulting in extreme hours).

b. Rick Turk (direct report supporting advanced analytics/modeling DTC Tech
   Talent Framework population), who departed in mid-January 2022.  He expressed
   that he experienced toxic client interactions with Technology/ISP HRBP, Chad
   Bauer.

c. Simon Marlow, who departed in mid/late February 2022 (reported to Lisa
   Komorowski supporting CNN (Comp Partner 1)) due to concerns for "writing on
   the wall due to Disco[very] merger" and he received an opportunity in tech to
   work for his dream company.

d. Lina Jing (Project Hire supporting career level guide work for DTC Tech Talent),
   who departed in May 2022 out of environment concerns based on messaging from
   new WBD leadership, and interactions with Chris Koski.  Chris was a Discovery
   compensation partner/consultant, who helped support the tech talent solutions for
   D+.  (He will be discussed in further detail below.)

e. David Yu (Comp Partner I supported WM Technology Office), who departed due
   to concerns over future team support and experiences to date per the
   WM/Discovery transaction, including Chris Koski.

f. Corey Nelson (Comp Partner II over Sports/ CNN-Digital), who departed in June
   15, 2022, citing negative experiences with Chris Koski and concern for the future
   given how the WM/Discovery transaction had been managed to date.

g. Angela Spivak (Comp Partner Lead for DTC BU/HBO Max), who resigned in late June, and departed by July 22, 2022, expressing workload concerns, an unclear future of new company, and combative experiences in trying to collaborate with Chris Koski.

h. Mi Chang, Corey Nelson and Angela Spivak each came from separate brands that were ultimately consolidated under WM. They lived through several transactions to date evolving with the companies as a standalone brand, then as Time Warner, where the brands were brought together under one holding company, to the AT&T acquisition of Time Warner, which created WM, the integration of all the brands (HBO, Turner, WB). Their experiences were very frustrating, sharing feelings of being passed over for key roles while others more favored and less qualified were appointed to roles. They also had concerns that the WM/Discovery transaction would be equally taxing and unfair.

37. Shortly after the deal closed in April 2022, my shrinking team was required to work with the only Discovery compensation partner team member, Chris Koski (younger, White male). Unfortunately, his disruptive (versus helpful) style was the final factor for three of my last team departures, who had the most exposure to him. Rather than help, he created more work for me and my remaining few team members. He would attend my team meetings inferring that he may be the new lead, replacing me. He would sabotage the integration and harmonization work by withholding Discovery information/data that we needed to solve for job mapping solutions, cost impact analyses, etc. Legacy Discovery client/HR Business Partners would express concern over delayed deliverables from Chris pre-merger. He went dark for one full week without any mention to me or his manager,

Scott Hayes/Discovery Compensation, leaving unfinished time-sensitive work to be picked up by me and my team.

38.   By June 2022, my direct team was most significantly impacted by the voluntary departures (5 FTEs and 1 Project Hire).  Ralph Beidelman, Discovery SVP Global TR, was named as the new WBD SVP, Global Total Rewards, replacing Jean Ermer and Joe Song as my manager/leader.

   a.  In early 2022 (prior to deal close), each WM BU was given a target headcount reduction/cost synergy goal.  It was explained to me and my peer Compensation Leadership Team that due to the high attrition experienced in my direct team, we met the HC/cost reduction target for the entire TR team; therefore, no other HC would be reduced in other parts of the team.  Essentially, I bore the brunt of the headcount reductions, saving the remainder of team from having to cut heads.

   b.  Jacque Wright (direct peer, Black male, 50), lost no HC/FTE – essentially his entire team has an average 15-year tenure and worked with Jacque his entire career at WB/WM/WBD.

   c.  Renu Jeyakumar (peer, Asian/Indian female, younger than me (40s)), leader for WM Comp Programs, lost one junior HC/FTE (was granted backfill and 2 additional heads in early 2023).  Renu is a peer level, but she has a different job/focus than Jacque and me.

   d.  Scott Hayes (peer from Discovery, White male, younger than me (40s) was given Executive Compensation role) received one additional HC during hiring freeze period.  Scott is also a longtime colleague to Ralph Beidelman and Ralph's successor.

18

e. Julie Paterman (peer from Discovery, White female in UK, younger than me (40s), who replaced Becky Eshalomi and Natalie Bosch, who took a packages and left) was named International Compensation & Benefits Consulting, received multiple new additional HC (I believe 5 in total) and promoted to Group VP. She has the smallest client group size (1 HR SMT (Senior Management Team) and 1 BU/ELT leader) and fewest employee population. (Jacque Wright and I each have 3 HR SMT and multiple BU leaders/ELT.) Julie does have multiple (more than two) countries. This created a lot of questions across all of the global compensation consulting team given the perceived unfairness and favoritism (larger teams/resources and promotion).

f. Brian Mullins (peer, White male) leads US and CAN Benefits (health/welfare), as VP, Benefits. He is a legacy from WB/WarnerMedia and also worked for Jean Ermer for many years.

g. Laurie Delahanty (peer from Discovery, White, younger female) worked for Ralph previously as a direct report at Discovery. She was a Director at Discovery and was made a VP, Benefits here at WBD! Her scope is very narrow, I understand her focus is retirement/pension US.

39. In the month of June 2022, several incidents occurred leading to my physical and mental breaking point.

a. I requested approval from new leader, Ralph Beidelman, for a $75,000 retention bonus to retain the last two departures, Corey Nelson and Angela Spivak (a $150,000 investment in key talent). Both were very long tenured team members

with considerable knowledge that were allowed to walk out the door.  My request was not approved and I was left to manage my clients with only <u>two</u> employees.

b.  Upon raising concerns about Chris Koski's performance to Ralph Beidelman and Scott Hayes (Discovery compensation team member/now peer, who was the manager of Chris Koski) following multiple unprofessional instances, I learned that Chris had been a performance problem employee receiving multiple verbal warnings.  This would have been key employee information to share with me prior having Chris aligned with my team.  While Ralph Beidelman would not approve retention bonuses in hopes to retain my last two key employee departures, I was required to manage a problem Discovery employee instead, which only added to the impossible situation I was put in.  I felt like I was being punished for raising my concerns.

c.  I asked Jean Ermer and Ralph Beidelman for resources from our other compensation teams to be shifted/shared or to lift the hiring/backfill freeze given the extreme circumstances on my team.  Neither were supported by Jean/Ralph. Jean Ermer claimed the other teams under Jacque and Renu were also extremely busy, yet, still operating with full teams (Renu lost one employee to voluntary attrition).  The exception to the backfill freeze was not granted.

d.  I had separate conversations with Jean Ermer and Ralph Beidelman, where I began to cry while expressing that I have been set-up to fail for a substantial period of time since joining and the toll it has taken on me and my remaining employees physically and mentally.  Neither Jean or Ralph took responsibility for

20

my lack of resources or showed any concern.  They provided no comfort to me, which was dehumanizing.

40. By July 2022, I was left with only 2 team members remaining, and a massive remit to lead integration for job architecture and compensation harmonization for my clients, including hyper-focus on integration of WM and Discovery streaming talent, which was a critical focus area, requiring an accelerated mapping of talent and cost assessment based on the different compensation strategies for each company.  These populations had a separate, differentiated compensation offering (DTC Tech Talent Career Framework) which was an additional focus area for my team only – e.g., additional initiative to drive/lead.

41. At the eleventh hour, Ralph Beidelman approved a budget for 2 – 4 junior consultants from Deloitte.  I was told to only start with 3 consultants and to later assess whether a fourth was needed.  This "temporary solution" will result in substantial work to select and onboard resources to augment what was now a team of few(Lisa Komorowski and Julie Clowe) and Chris Koski and me.  This solution was also extremely expensive!  Each Deloitte consultant billed $300-$350 an hour.  The total cost for their support totaled approximately $2 million.  I was only asking for $150,000 to save two employees who would have been more effective than the time required to on-board, teach, and manage the Deloitte consultants.

42. Following a series of panic attacks, the start of unwanted weight loss, and the return hair loss, I saw my PCP on July 7, 2022, and was immediately directed to begin a medical leave of absence.  This only sent me into further panic as I could not leave Lisa and Julia

21

without the resources onboard – it was a huge undertaking to set up and effectively onboard new people at WBD – the contractor onboarding process is not efficient.

43. My medical leave of absence began July 25, 2022. Lisa Komorowski was the only remaining senior level member of my team. She was the interim leader in my absence. Now, she was left with one analyst and Chris Koski, and 3 (eventually 4) new Deloitte contractor/consultants, who were not issued WBD laptop computers for several months; and therefore, not able to be very productive or effective initially, only created more anxiety. Two former members of my team, Shimena Terry and Danielle Morton, who had moved to Jacque Wright's team on January 2021, took on the News & Sports BU (Lisa's client group) when I was already on medical leave as a shared resource given Lisa had to support all of Technology and Streaming. I hated the fact that I had to leave Lisa to manage the impossible in my absence. This weighed heavily on me and only added to the panic I experienced. I felt like I was forced into this no win situation, which did not help my symptoms.

## FMLA LEAVE

44. I went on medical leave of absence from July 25, 2022 to November 1, 2022. During the leave, I dropped to a very unhealthy 100 pounds (normally I weigh 117), my hair had severely thinned (again). I was having therapy twice a week and saw my PCP regularly/weekly as he dialed in the right dosage for all of the medications I was prescribed. I took anti-anxiety (high dosage), anti-depression and sleeping medication daily with Xanax, as needed, for panic attacks.

45. Due to the medical insurance plan I have, most costs were not covered. I was also referred to therapists, most costs were not covered. I have incurred an estimate of

$30,000 in medical expenses (excluding the gastroenterology and cardiology testing from December of 2020, which were ordered to understand why I was getting physically ill/vomiting every few weeks during my initial hostile experience with Sharon White while implementing the DTC Tech Career Framework).

46. While I was on leave, Chris Koski, the troublesome Discovery team member, exited the company in August/September of 2022. Approval was granted to backfill the role. I hired another senior team member while I was on leave (which I should not have been doing, but I worked behind the scenes out of desperation to try to rebuild the team). Anne Sieh (who I had worked with at Accenture previously), started at WBD on October 19, 2022.

## ADVERSE ACTION

47. Upon my return on November 1, 2022, my team was staffed with 3 FTEs and now 4 new Deloitte contractors. I was sharing 2 HC with Jacque Wright to support News/Sports. One of the other 4 frozen roles (Advanced Analytics & Modeling role) since January 2022 was finally opened/posted while I was on leave; however, I was still at a 3 FTE HC deficit when I returned from leave.

48. When I returned, I was advised by my PCP to only work 50-80% my first few weeks, which barely lasted a couple days given the tremendous amount of work to be done and new team member (Anne Sieh) to help onboard given she started two weeks prior. I felt terribly that Lisa Komorowski had to fill in my absence, and desperately wanted to relieve her workload. During my leave she would occasionally call me in tears. I was stepping back into an equally unhealthy work situation. I tried my best to manage the

boundaries. Ralph told me to do whatever I needed to do, but did not offer any solutions. His advice was met without actual support.

49. The Deloitte consultants were just starting to make an impact as a I returned, but their contracts were set to end on December 15, 2022, so I busily began working on the request for their extension because leadership would still not allow me to fill the other 3 frozen FTE roles. Within their last week, the extension was approved but only until January 30, 2023. Given it was approved last minute, each consultant already had PTO plans in January; however, we took whatever time they had available given we were launching the extremely busy annual planning season for the first time as WBD.

50. At the same time in mid-December 2022, I learned of HR Business Partners who have been impacted and asked if possible, to bring on a resource to help project manage the WBD Tech Talent Strategy work, which my team needed to solve for as compensation programs were to be harmonized. We brought on one impacted resource through March 2023. The amount of work to seek out my own resources to do my job and the administrative legwork were enough to be an additional full-time job! I feel there is no care that I just returned from a medical leave of absence. Once again, I was not set-up to succeed. Soon in 2023, the panic attacks returned, which I still manage via medication. I have been on medication for over one year!

51. Given the massive amount of work the Compensation Team(s) were leading and the continued hiring freeze, in January 2023, I requested to extend Deloitte for a second time through end of March 2023. This was a huge effort once again! The administrative process to extend contractors required sets of approvals each time, extensions in Fieldglass systems, which was a nightmare, and painfully slow process with Contingent

Worker Management Office ("CWMO"). The team and I continued to work extremely long hours, and everyone was burned out. My continuous ask to leadership and HR, was to unfreeze the roles for my team versus the constant work to beg and negotiate extending temporary resources.

52. With the looming end of March 2023 roll-off of Deloitte contractors, the team and I were very concerned about resources. A business case is put forth to Ralph Beidelman and Adria Alpert-Romm (Chief People Officer) requesting backfills of my remaining 3 frozen roles (since deal closed in April 2022). I had several email exchanges from about March 3 to 18, 2023 with HR/Ashley Royal for support in securing FTE resources.

53. On March 18, 2023, Ashley informed me that Adria did not approve the full request. I gained approval for 1 of the 3 backfills, but the other roles are down leveled to the most junior Analyst level, and as contractors/temporary hires, not FTEs.

54. Following this approval in mid-March 2023, my team was still at a 2 FTE deficit and given added work to manage the administration of contractor work and now an outside placement agency! The experience was awful, massive administrative/system red-tape, and constantly losing contractor candidates as the agency was not moving quickly.

55. The entire situation became so frustrating that one of my directs, Anne Sieh, on March 13, 2023, chose to go directly to Ralph Beidelman to make her own plea for resources given the desperation felt across the team.

56. In the meantime, my peers' compensation teams were receiving additional heads in addition to unfreezing previous backfills. For example, Renu Jeyakumar (younger, Indian female), who leads Compensation Programs, was now up 2 FTEs beyond the team resources at deal close.

57.     Then, Julie Pateman (legacy Discovery, White female, and younger than me), who is based in London/UK was given the International Compensation & Benefits role, and provided multiple new headcounts for international compensation and benefits consulting team and promoted to Group VP.  Her total team size has become 40 headcount supporting compensation and benefits international (Becky Eshalomi and Natie Bosch were the compensation and benefits leads for WM International and had a total team of approximately 15 – 18 FTEs).  In fact, while my small team suffered, Julie was able to build up her team.  With her promotion to Group VP, she received two VP roles under her.  Julie is very close to Amy Girdwood, who is a very senior HR leader from legacy Discovery.  Amy carries a lot of weight/influence.  She has close working relationships with Global Streaming and Interactive business leader, JB Perrette, and Chief People Officer, Adria Alpert-Romm.  So, when Julie needed help, she was promoted, received an increase in HC and received 2 VPs.  This was extremely unfair as my role carries the largest portion of the employee population, key growth areas for WBD and four ELT business leaders with three HR/P&C SMT leaders than Julie's yet she is given a team that far outnumbers mine at 40!  (Noting that benefits is part of her remit.)

58.     The two VPs under Julie are two White, younger women, Karen Kinzett-Evans and Kate Brenneke.  Karen and Kate each have 15 people under them while I only had 4 FTEs and still at a 3 FTE deficit (with the Executive Director title).  Prior to being given the VP title, Kate was contractor who was not even a full time employee and focused only on compensation projects.  While Karen's role focuses on benefits.  Yet, my team and I was expected to not only do our "day job" but also take on compensation projects, including the high visibility Tech Talent harmonization effort.

26

59.    My team was aware of how the other teams under Ralph were/are staffed, which added to the continuous frustration as we/my team worked feverishly to keep up with the workload while continuing to have to operate at a resource deficit. My team has asked questions about why their roles have not been elevated, what criteria was used to level the two VP roles in international, or why they were not considered for larger roles.

60.    As the unfair and seemingly impossible resource/capacity situation continued through the summer 2023, my last attempt at a solution was to propose a US/CAN Compensation Consulting team reorganization design that addressed the "spans and layers" initiative expected to be met across the company, by removing the VP Compensation layer (my layer) on the US/CAN compensation consulting team in order to fund the additional heads needed to finally somewhat adequately staff the consulting team under me. This organization design proposal would also provide a cleaner alignment of the compensation partners to each HR Senior Management Team ("SMT") member allowing for a more seamless and direct partnership. I felt I had no other option but to make this proposal in order to provide my team what they needed as I was not given enough support despite my several pleas. My team was the smallest but dealing with some of the more complex client groups. WBD made my work environment so hostile that I had become the sacrificial lamb and it should not have been this way. I believe I was manipulated and put into an extremely untenable situation. Rather than receiving recognition and reward for the effective work my small, but mighty, team was driving; we felt we were being punished.

61.    The proposal was made on August 22, 2023 to Ralph Beidelman. HR (Ashley Royal and Michiko Sheppard) agreed with the proposed reorganization design for the US/CAN

Compensation Consulting Team. Jacque Wright was included in the meeting to discuss the team reorganization and compensation partner/consulting team realignment to HR SMT.

62. Ralph took the proposal into consideration and scheduled a follow-up call for August 24, 2023, to share his response after he discussed it with Adria Alpert-Romm.

## ADVERSE ACTION

63. On August 24, 2023, Ralph accepted the team reorganization proposal as a solution to (finally) fund more resources for my team and address the "spans and layers" effort expected across the company. I was being discriminatorily terminated based on my race, gender and disability! Ralph offered severance to me and Jacque in exchange for a six month stay period (through March 1, 2024). Allegedly, Jacque was eligible for a 12-month severance package due to his 17 year tenure. I did not quit my employment and I did not request severance. I was told I was only eligible for 26 weeks, or six months, severance package (despite my different interpretation of the Severance Plan currently in effect). My interpretation of the Severance Policy would suggest a 36-week severance package. The Severance Plan currently in effect indicates that there is a minimum severance of 26 weeks PLUS 2 weeks for every year of service (4 years) and a 2 week base line. Adding insult to injury, I was offered less than what the Severance Plan provides yet Jacque Wright received full value under Severance Plan. This was clearly an adverse and discriminatory action based on my race, disability, and gender. Further, a total disregard for my mental and physical health and well-being as I had returned from a medical leave of absence ten months ago.

28

64. With almost one-year since my medical leave of absence, my physical and mental well-being is of serious concern for me and my family. The grueling and unfair demands have continued to take a toll on me while having remained on various medications and weekly therapy sessions for over a year to continue managing through a toxic work environment.

65. From August 24 to September 22, 2023, there were various discussions between me and Ralph or me and HR/Ashley Royal. I expressed the serious mental/physical concerns that I had based on a requirement for me to stay through March 1, 2024. My hair had begun to fall out in clumps again due to the stress and I began feeling similar to when my cortisol levels were extreme requiring that I return to taking to supplements to help regulate. I was completely drained, and I currently have chronic fatigue, yet I do not sleep well, such that I cannot show up for my family as I should.

66. I expressed to Ralph and Ashley/HR my well-being concerns. When discussing these concerns with Ashley only, her response was, "Yes, I know Elle, I have heard you say this a million times." I left the discussion feeling dismissed, desperate, and without support for my well-being despite the history and medical leave of absence caused by the circumstances and environment in which I was required to operate. All the while I continued to lead my team with impactful contributions to ensure the success of the critical work we were/are driving.

67. On September 13, 2023, I drafted a recap email to Ralph Beidelman summarizing our live discussion, describing my willingness to remain with the team through December 31, 2023 in order to focus on filling and onboarding the now 5 total (unfrozen backfills and new) FTEs to ensure my team would be set-up for success given my job elimination. I would also continue leading the team through the launch of the new WBD Global Job

29

Architecture (finally) and the annual planning process preparation for the first harmonized cycle, in exchange for a retention bonus equivalent to a prorated amount of the offered six-month severance (e.g., four months of the six month severance), which seemed reasonable and very cost conservative to the company. Despite my frustrations with my hostile work situation and the lack of support, especially from Ralph, I remained cordial, professional, and cooperative as I did not want further retaliation to occur. However, Ralph outright disagreed with my proposals.

68. On September 19, 2023, I met Ralph and my peers in person for the first time in Atlanta. On September 20, 2023, Ralph asked me for an update regarding a decision on his offer/proposal. I reminded him of my medical leave of absence because of the untenable situation I was put in by him and the Company. I stressed that I was the primary provider for my family and that I did not feel healthy even after returning from FMLA leave due to the continued hostile work environment. It was hard for me to admit as I had never experienced this before, including when I was working in more complex, high demand positions. I struggle to inconvenience my clients or my team, even at my own expense. I expressed this to Ralph. However, Ralph told me to think about his offer a couple of more days. Given Ralph's direct report team was together in person in Atlanta, I did not feel comfortable holding firm to my request while within the direct line of vision to my peers out of concern for the awkwardness and disruption as we all had another day together.

## ADVERSE ACTION

69. It is also important to highlight that Ralph has been in Los Angeles, California many times, which is where Renu and Jacque (my peers) are based. Scott (my peer) has been

to Los Angeles and New York City a few times with him. Ralph has also been to London several times in the past couple years, which is where Julie Pateman (my peer) and her directs are based. However, Ralph had never been to Atlanta, Georgia to meet me in person until September 19, 2023, which was the first time I had ever met him live. In contrast, others have met in person and with Ralph in person several times prior. WM/WBD's main hubs and locations listed for hiring are New York City (headquarters), Los Angeles, and Atlanta in the US. I am the only Atlanta direct to Ralph (very recently (September) he took on the Mobility function and that leader is in Atlanta). London is the main location outside of the US. Interestingly, geographically speaking, I am located closest to Ralph, yet I was the only one who had not met with him in person until September 19, 2023. I felt like Ralph continually put me at a disadvantage and being the only one of my peers who had not met him in person until September 19, 2023 (over a year since he became my manager), was another example of his discriminatory treatment of me compared to my peers.

70. Further, Scott and Renu have been to the New York office while I was never approved to travel. While Scott's role has been over Executive Compensation and Compensation Committee meetings have been held there, Renu was allowed to travel for one of the Comp Committee meetings in New York simply because she wanted the exposure.

71. Discussions between Ralph and I continued through September 22, 2023 (progress was delayed given Ralph held his first in person Leadership Off-Site in Atlanta). I had agreed to help with planning/logistics, so I kept my commitment to avoid an awkward situation.

72. Ralph was only willing to offer 1 month of the severance payout in exchange for me staying through December 31, 2023. I said that this felt extremely unfair and did not

31

follow any retention guidance or precedent set forth to date.  Based on my experience in

handling these critical talent retention situations frequently for my client groups, and my

knowledge of how other executives have been treated in the same reorganization

situations, I was being treated very unfairly and essentially left with no choice but to

leave without any severance or eligible prorated bonus as an impacted employee, out of

concern for my well-being.  Ralph's response was, "No," and that he would only give me

1 month.  I was extremely frustrated with Ralph's unfair treatment and responded that his

ask of me did not even follow retention award guidance for key/critical talent.  The

guidance is 1-2 weeks of time per month asked to stay with key talent leading critical

work receiving the upper end, 2 weeks.  In fact, people would ask for more and if they

were favored enough, it would be approved.  However, I was given the lowest end of

guidance when most key talent leading critical work got 2 weeks or more!  Once I called

out Ralph on the unfair retention bonus treatment, he only went from 1 to 2 months of

pay instead of the 4 months I requested – again, still less cost than the severance would

be.

73.    Out of feeling pressured, on September 20, 2023, I mentioned possibly considering

March 1, 2024 only with limited availability in January and February of 2024 focusing on

the transition to Scott.  Ralph was not amenable because compensation planning occurs

during those months, and expected that transition would be done at the end of February.  I

was getting nowhere with Ralph.  Frustrated, <u>I told Ralph that after our September 20,</u>

<u>2023, discussion I did think about it more and I would not accept any less than what I</u>

<u>was asking (this conversation occurred on September 22, 2023).  However, Ralph's blunt</u>

<u>response was that my last day would be October 2, 2023 then.</u>

74.   At that point it was September 22, 2023, and the delay for agreement brought me one
      month closer to my earned WBD annual bonus, which requires an employee to be active
      on December 31, 2023, to receive their annual bonus.  My bonus at target was my
      $290,000 base salary multiplied by my 30% target = $87,000 (and ideally more as a top
      performer).

75.   Impacted employees via job elimination/reorganization are eligible for their prorated
      annual bonus based on term date in the year, as long as they have worked 180 days in the
      fiscal year.  I am an impacted employee based on the memorandum Ralph drafted as his
      team announcement, described below.

76.   Ralph was not willing to agree to my stay proposals.  I believe he manipulated my
      situation to force me into a no win situation no matter what I did.

77.   On Monday, September 25, 2023, Ralph drafted a Compensation Consulting Team
      Reorganization Announcement memorandum for HR SMT/P&C explaining he had
      chosen to "streamline his senior management team" and "as a result, Jacque Wright and
      Elle Lalli will be leaving the company."  This memorandum draft was sent to his senior
      management team for review and verbally shared with HR SMT/P&C Leadership in a
      meeting on Tuesday, September 26, 2023.  Per this memorandum, I did not resign from
      my employment, rather I was being terminated/eliminated by WBD.

78.   I was not being offered severance nor any portion of my 2023 annual bonus that I was
      eligible for because they allegedly considered me to be a resignation since I felt I could
      not physically/mentally remain for six more months.  However, Ralph communicated my
      departure as a reorganization job elimination.  No employer can make an employee
      resign.

## ADVERSE ACTION

79. In contrast, Jacque Wright's severance package is for 12 months of severance. He ultimately agreed to stay through March 1, 2024.

80. As a result of this announcement, I sent an email to Ralph Beidelman and Ashley Royal on September 25, 2023 stating that I would not be resigning and never wanted to resign rather I simply wanted the resources needed to carry out the demands of my job. Ashley Royal scheduled a meeting with me on September 28, 2023, to discuss. I stated that, "I am not resigning, I never intended to resign." This email caused a pause in the announcement memo being formally sent to HRLT/P&C Leadership for cascade to their respective teams.

81. Ralph also canceled a transition meeting scheduled on September 29, 2023, with me and Scott Hayes (White male, younger than me), who was described as taking over my role upon my departure on October 2, 2023. The announcement also mentioned Scott's promotion to Group VP as part of the "team streamlining." The announcement memorandum included an illustration organizational chart of my team with Scott's name shown as replacing mine. Scott is not the most qualified to take over my role. However, this does indicate WBD's discriminatory intent to replace me with a younger male employee.

## PROTECTED ACTIVITY

82. On Sunday, October 1, 2023, I sent a discrimination claim email notification to Ralph Beidelman and Ashley Royal. As a result, the discussion invite via Zoom for Monday, October 2, 2023 (which was sent to me Friday, September 29, 2023) with Ralph and Ashley, was canceled.

34

83. On Monday, October 2, 2023, Ashley Royal acknowledged my discrimination claim email, and informed me the People Relations would be reaching out to me "about my concerns."

84. I received a meeting invite from People Relations ("PR") later that afternoon. The meeting was set for Tuesday, October 3, 2023, at 12:30 pm ET. I responded to this meeting invitation by informing PR that I would not be discussing my concern with them per legal advisement. They responded by saying "…your lack of cooperation limits our ability to investigate." They later offered the name and contact information for the company attorney to provide to my legal counsel, which I confirmed I wanted. This information was provided to me on October 4, 2023.

85. On October 4, 2023, I had a 1:1 with Ralph Beidelman, which was strictly a work discussion. Nothing of note occurred.

86. During my entire tenure at WM and WBD, no performance ratings were done. I was the recipient of a "special Kicker Bonus" during the annual planning cycle of 2021 intended for top/critical talent. I also received two separate and consecutive retention bonuses, one awarded in 2021 for stay through merger close following April 2022 (paid in June 2022, upon information and belief). A second was awarded after returning from medical leave (November 3, 2022) as most of the compensation team was given a stay/retention bonus due to the heavy lift in compensation for the harmonization work, which was paid out on June 30, 2023. Given my impossible workload and still getting paid less for my work compared to Jacques, this bonus was actually lacking.

87.     I received unsolicited very positive feedback for my work and leadership of a small, but
        mighty team that made a noticeable impact to the business/client groups we support. I
        led high visibility and critical work within the tech/streaming space, in particular.

88.     Despite the positive feedback, WM/WBD showed no interest in my future with the
        company or me moving upward or laterally. There was no effort to understand my
        previous experience, which began as a consultant for approximately 10 years followed by
        a transition into corporate roles with mostly large, complex global companies. In fact,
        there were no career conversations at all, which was very odd to me. In one of my very
        first conversations with Ralph I mentioned my interest to expand beyond compensation
        and my career goal to work abroad. There was no follow-up ever. WM/WBD's lack of
        interest in my future is a clear indicator that my days were numbered there.

## ADVERSE ACTION

89.     On October 9, 2023, Ralph shared the announcement regarding changes he would be
        making on the Compensation leadership team. This announcement formally informed
        Ralph's direct reports and my team of my "departure" from WBD on March 1, 2023.
        The announcement also indicated that "Scott Hayes [White, younger male] will be
        overseeing all client support and executive compensation supporting the Compensation
        Committee. Renu Jeyakumar [younger Asian female] will be overseeing the design and
        administration of WBD's annual planning process, ICP, and equity programs. Julie
        Pateman [younger female] will continue to oversee international compensation and
        benefits." Thus, I (and eventually Jacque Wright (Black male, age 50) would be replaced
        by a White younger male worker. As stated above, Scott was not the best person for the
        role, but benefited from WBD's bias as he was given the Group VP role. The Group VP

title has been applied across WBD HR/P&C without following intended criteria, instead it is more of a favoritism title, which comes with higher pay.

90. Further, the announcement reads as if I was terminated/eliminated, which was not the case. Many colleagues/partners were shocked by the announcement as I was a strong partner and they did not understand why I was being eliminated.

91. On or about the week of October 16, 2023, my team discovered that Scott and Renu (both younger than me) were promoted already as they were both designated as Group VPs in our systems despite not performing their roles as I was still working. With their Group VP designations, they likely are also enjoying an increase in their base salary and equity despite not yet doing any of the work. In fact, I was told I could not begin transitioning work until February of 2024.

92. The early promotion of Renu also underscores WBD's discriminatory preference for younger workers as I was now the only member of the Compensation leadership team that was not carrying a VP title and was the only an Executive Director. Further, I am several years Renu's senior and she has far less experience than me. Yet, she was freely given the VP title when I have fought for my title since the beginning and still do not have one that accurately reflects my level as VP. This has caused new client groups to question my role/experience because of my title in the system, which makes it hard to do my job at times. This is clearly retaliation for my complaints. As I explained above, title is very important in this company and the media/entertainment industry as a whole (it is a symbol of importance and authority).

93. On November 7, 2023, I attended via Zoom a Townhall that Adria Alpert-Romm hosted for all of HR all over the world. The Townhall took place at the WBD headquarters in

New York with two layers below Adria invited, which would include my level and my peers' levels. When I attended the Townhall via Zoom, I saw, much to my surprise, Renu Jeyakumar and Scott Hayes on the video sitting in the room in New York City where the event was held! In addition, Julie Pateman, who is based in London, was there as well. I was not invited to attend in person. As described above, I have not been authorized to travel while Renu and Scott (both younger than me) have been allowed with this event as the most recent occurrence. Renu, Scott, and Julie's presence does not make financial sense as both are located out of state – Renu in California and Scott from Tennessee and in Julie's case, out of the country! Being where several of my key stakeholders were present would have been ideal for me to tackle the WBD harmonization effort of premium tech talent and beyond. Again, making my ability to carry out my role harder. While Scott and Renu have been promoted prematurely to Group VP, they have not actually started their roles while I continue to work in the role Scott will assume with merely an Executive Director title. WBD's disparate treatment based on my age has only continued despite my reports of discrimination.

94. I will be terminated from my employment on March 2, 2024.

95. I was required to work in a hostile/toxic environment while under duress caused by long hours due to lack of sufficient resources and harassment/discrimination as I described above. I was constantly requesting additional support/fighting for my team to be properly staffed to carry out responsibilities/demands of roles in support of my client groups – this occurred while at WM and became significantly worse at WBD. The reasons for my untenable stress should not exist. Despite the toxic environment surrounding my team, I have created a very open and supportive environment for my team. My team often

expresses the appreciation for the safe space on a regular basis suggesting it is the reason why they stay/joined the team despite our many unfair challenges.

96. Currently, the Board of Directors of WBD is made up primarily of White males, with only three women, two Black women and one Asian woman. There is no White female representation on the Board. Further, the executive leadership team at WBD is a majority White males. There are only three women, two are Black and one is White. All three of the women are legacy Discovery. This indicates that from the top, White women are not adequately represented in such a large company.

97. I was unlawfully discriminated against on a continuous basis during my employment because and substantially because of my race, sex, gender, age, and disability. WM/WBD discriminated against me in the terms, conditions, and privileges of employment on account of my protected statuses. WM/WBD has established a continuous pattern and practice of discriminating against White, female, older, and/or disabled employees in favor of other similarly situated employees not part of the same protected class(es). These unfair behaviors are especially obvious within the Global TR team lead by Ralph, my supervisor.

98. The emotional impacts of the discriminatory treatment, in addition to already severe manifestations described above, I received while working at WM and WBD have severely affected my marriage given the extreme hours I was working to keep up with lack of resources at work, missing school activities or events at school/sports for my children, and forgetfulness with certain personal deadlines (taxes needed extension request, certain medical bills went to collections), which is very unlike me! I had never experienced this before working for WM/WBD. I was also prescribed sleeping

39

medication as I was barely sleeping for several months straight leading to the mental breakdown/panic attacks. I was diagnosed with Generalized Anxiety Disorder with Depression and Insomnia, and participate in weekly therapy for chronic adjustment disorder caused by anxiety and depression due to my hostile work environment and discriminatory treatment by WM and WBD.

_Elle Lalli_ 11·13·23
Elle Lalli          Date

Notary Acknowledgment

Subscribed and sworn before me on this _13_ day of _____, 2023 in the State of Georgia, County of _____ : _____.

_____
Notary Public

My commission expires: _____

40